FREDERICK L. LECKIE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 86565.    Promulgated February 1, 1938.

*Arthur E. Petersilge, Esq.*, for the petitioner.
*T. M. Mather, Esq.*, for the respondent.

---

[3] See O. D. 999, 5 C. B. 102 (1921), and I. T. 1606, II-1 C. B. 69 (1923), revoked by G. C. M. 13469 (1934).

OPINION.

MELLOTT: The Commissioner determined a deficiency in petitioner's income tax for the year 1934 in the amount of $867.29. In an amended answer which he, as respondent, filed in the instant proceeding he not only denied that he had erred in determining the deficiency but alleged that he had erred in not increasing petitioner's net income by the addition of $3,004 as a capital net gain. He accordingly asked for an increased deficiency. Petitioner, in his reply, admitted that such capital gain was realized. Effect will be given to this admission in a recomputation under Rule 50.

The sole issue for determination is whether or not the respondent erred in disallowing the deduction from gross income of $4,610.35 as a bad debt. In the notice of deficiency it is stated that said amount was disallowed because a bondholders' committee, acting for the holders of bonds issued by the Morgan Properties Co., had "acquired the properties of [the company] in pursuance of a plan of reorganization, hence under section 112 (b) of the Revenue Act of 1934 no loss is recognized."

The petition alleges that the respondent erred in disallowing the amount claimed and in holding that the bonds were not ascertained to be partially worthless; that he erred in holding that the committee acquired the properties "in pursuance of a plan of reorganization in such manner as to prevent the recognition of loss under section 112 (b)"; and that he "erred in holding that a partial bad debt deduction cannot be allowed if the holders of the bonds evidencing said debt participate in a plan of reorganization by means of which they acquire the properties of the debtor which were mortgaged to secure the debt."

All of the facts were stipulated. A summary will be sufficient for present purposes.

In November 1926 petitioner paid $5,000 for $5,000 par value bonds of the Morgan Properties Co. (hereinafter called the Morgan Co.). The bonds were secured by a mortgage covering all of the properties of the Morgan Co., consisting of two parcels in Ohio and one in New York. The Morgan Co. leased all of its properties to the Morgan Lithograph Co. (hereinafter called the Lithograph Co.), the agreed rental being an amount equal to the interest on the bonds, the annual maturities of the bonds, and taxes and operating expenses of the Morgan Co. The Lithograph Co. sustained losses from its operations for each of the four years ending June 30, 1929, to June 30, 1932, inclusive, and failed to pay the rental maturing August 1, 1932. The Morgan Co. defaulted in the payment of principal and interest due on its bonds August 15, 1932.

The bondholders' protective committee (hereinafter called the committee) was formed December 1, 1932. On January 5, 1933, petitioner deposited his bonds with the committee. Ultimately 97 percent of the $1,280,000 outstanding bonds were so deposited. The Union Trust Co. of Cleveland was the designated depositary of the bonds. All depositing bondholders assented to the provisions of the bondholders' protective agreement.

On June 3, 1933, the United States District Court at Cleveland, Ohio, appointed a receiver for the Lithograph Co. upon the application of one of its creditors. The trustee for the bondholders filed a claim for the rent due the Morgan Co. and received three dividends, totaling $86,043.71, in 1934. Nondepositing bondholders received their shares of this sum in cash, while the shares of the depositing bondholders were paid to the committee.

Under date of July 1, 1933, the committee adopted a "plan of readjustment" and forwarded copies thereof to all bondholders on July 6, 1933. Bondholders assented to the plan by depositing their bonds with the committee, or by permitting them to remain with the committee if they had already been deposited. In accordance with the provisions of the plan the following steps were taken:

On January 12, 1934, the committee caused the trustee for the bondholders to commence foreclosure proceedings. On June 4, 1934, the Payne Avenue plant of the Morgan Co. located in Cleveland, Ohio, was sold at public sale pursuant to the foreclosure decree. The committee bid $75,250 and its bid was accepted.

On June 5, 1934, the committee organized an Ohio corporation known as Industrial Properties, Inc. On July 11, 1934, the committee assigned to this corporation the $1,235,000 principal amount of the bonds which had been deposited with it pursuant to the plan and also its bid at the foreclosure sale. Most of the sum bid at the foreclosure sale, or $69,145.29, was paid by a credit in that amount endorsed on the deposited bonds, the balance of the debt represented by the bonds remaining uncanceled. The difference between the sale price and the amount credited on the bonds (which difference was for court costs and other cash requirements of the foreclosure), was paid in cash out of the funds received by the committee in connection with the claim for rent due from the Lithograph Co. All of the capital stock of the new corporation, Industrial Properties, Inc., was received by the committee and held by it during the year 1934 for the benefit of the depositing bondholders.

On November 30, 1934, the second parcel of Ohio property of the Morgan Co., was sold at a public sale, pursuant to the foreclosure decree. Industrial Properties, Inc., was the purchaser, the price bid being $30,000, of which $27,096.32 was paid by a credit in that

amount endorsed on the deposited bonds. The balance of the debt represented by the bonds remained uncanceled and the difference between the sale price and the amount credited on the bonds was paid in cash out of the proceeds of the claim for rent.

Industrial Properties, Inc., leased the first mentioned property for two years to a corporation formed to continue the business of the Lithograph Co. This corporation was given the option to purchase the property under lease for $500,000 at any time while the lease was in effect. The last mentioned property was leased to an Ohio corporation engaged in the business of producing continuous business office forms printed on paper.

The New York property could not be sold for enough to produce any substantial return to bondholders, and this situation existed prior to December 31, 1934. Following the receipt of an offer from Laundered Service, Inc., a New York corporation, in June 1935, the committee caused foreclosure proceedings to be instituted on the New York property covered by the mortgage. At the foreclosure sale in December 1935, Industrial Properties purchased this property for $46,000. It applied the deposited bonds in part payment of the purchase price, leaving the balance of the debt represented by the bonds uncanceled. It paid in cash taxes of approximately $18,060, and also court costs in connection with the foreclosure. Industrial Properties, Inc., immediately transferred this property to Laundered Service, Inc., for $45,000, of which $15,000 was paid in cash and the balance was represented by a bond secured by a purchase money mortgage.

Under date of October 1, 1936, the committee wrote a letter to the depositing bondholders, including petitioner, advising them of the action theretofore taken pursuant to the plan. The letter stated that the committee, in accordance with the plan, would distribute the capital stock of the new corporation to holders of certificates of deposit on the basis of one share for each $100 principal amount of bonds deposited with the committee and that the new corporation contemporaneously would pay a dividend of $2 per share. Petitioner surrendered the certificate of deposit which had been given to him when his bonds were turned over to the depositary and on October 19, 1936, received 50 shares of the capital stock of Industrial Properties, Inc., and $100 in cash representing dividends at the rate of $2 per share.

Nondepositing bondholders have received cash distributions totaling $154.5873 per $1,000 bond, representing their proportional interest in the amounts received through sale of the properties and on the claim for rent filed in the receivership of the Morgan Co. Of this sum they received $127.928 per $1,000 bond during 1934.

Petitioner is one of the partners in the firm of Duncan, Leckie, McCreary, Schlitz & Hinslea, attorneys, of Cleveland, Ohio, which represented the trustees for the bondholders under the trust mortgage and prosecuted the Ohio foreclosure action, including the sale of the two Ohio properties owned by the Morgan Co. The facts with respect to the condition of the Morgan Co. were known to these attorneys (including petitioner) in 1934. Petitioner determined in 1934 that the debt represented by the bonds was partially worthless, made a partial charge-off of $4,610.35 in 1934, and claimed a bad debt deduction of this amount in his income tax return for that year. This deduction was disallowed by the respondent.

At the hearing both parties made reference to the case of *Irene O. Kitselman*, 33 B. T. A. 494, which had been reversed by the United States Circuit Court of Appeals for the Seventh Circuit in *Commissioner* v. *Kitselman*, 89 Fed. (2d) 458, and upon brief it is discussed at length. At the time of the hearing application had been made to the Supreme Court for a writ of certiorari but the writ had been neither denied nor granted. Respondent, having prevailed in the Circuit Court and the facts in the instant proceeding being somewhat analogous to those in that case, relies upon the decision of the court. Petitioner, while admitting that an affirmance by the Supreme Court of the decision of the court in the *Kitselman* case would have been decisive of the present controversy, nevertheless urges that the Board give further consideration to the question since the denial of the writ, which has subsequently occurred, 302 U. S. 709, is not tantamount to a decision by the Supreme Court upon the question decided. In other words, he relies upon the decision of the Board. The Board has therefore made a careful reexamination of the whole question, and has given due consideration to the argument and authorities cited by both parties, including the opinions of the court and the Board in the *Kitselman* case.

In the *Kitselman* case the Board held that there was not an exchange of stock or securities within the meaning of section 112 (b) (3) of the Revenue Act of 1928 since, under the view then held by the Board, there was not a reorganization within the definition of that term in section 112 (i). The Circuit Court, having before it the group of cases decided by the Supreme Court December 16, 1935, especially *Helvering* v. *Minnesota Tea Co.*, 296 U. S. 378; *G. & K. Manufacturing Co.* v. *Helvering*, 296 U. S. 389; and *Helvering* v. *Watts*, 296 U. S. 387, reversed the decision of the Board and held that there was a reorganization. It held, citing the above cases, that bonds are securities within the meaning of the statute and that they, but not mere short term notes, represent sufficiently definite, material, and substantial

interest to satisfy the implicit requirement of a "continuity of interest." Cf. *Pinellas Ice & Cold Storage Co.* v. *Commissioner,* 287 U. S. 462; *Cortland Specialty Co.* v. *Commissioner,* 60 Fed. (2d) 937. The Circuit Court of Appeals for the Ninth Circuit, in *Lilienthal* v. *Commissioner,* 80 Fed. (2d) 411, has held under the same section of a later revenue act that collateral trust bonds of a corporation, which were exchanged for stock, are securities within the meaning of such section. The Board has made a similar holding in *Kaspare Cohn Co. Ltd.,* 35 B. T. A. 646 (on appeal to the Ninth Circuit) and *Lucien H. Tyng,* 36 B. T. A. 21. There is no difference in principle between those cases and the case at bar, though in them stock was exchanged for bonds while in the instant case bonds were exchanged for stock. But the statute (sec. 112 (b) (3), *supra*) in each instance refers to "stock or securities." It seems, therefore, that the court was fully justified in concluding that the bondholders had effectuated a statutory reorganization and that a similar holding should be made in the instant proceeding.

If, however, the Circuit Court erred in holding in the *Kitselman* case that a statutory reorganization had been effected—which we do not intimate—and if we are wrong in making a similar holding here, which carries with it, as it does, a holding that section 112 (b) (3)[1] of the Revenue Act of 1934 is applicable, respondent must nevertheless prevail. Section 112 (b) (5)[1] is clearly applicable and under it no finding need be made that there was a reorganization. It pro-

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(a) GENERAL RULE.—Upon the sale or exchange of property the entire amount of gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.

(b) EXCHANGES SOLELY IN KIND.—

\*         \*         \*         \*         \*         \*         \*

(3) STOCK FOR STOCK ON REORGANIZATION.—No gain or loss shall be recognized if stock or securities in a corporation, a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization.

\*         \*         \*         \*         \*         \*         \*

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.

\*         \*         \*         \*         \*         \*         \*

(g) DEFINITION OF REORGANIZATION.—As used in this section and section 113—

(1) The term "reorganization" means (A) a statutory merger or consolidation, or (B) the acquisition by one corporation in exchange solely for all or a part of its voting stock; of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation; or of substantially all the properties of another corporation, or (C) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred \*   \*   \*.

vides that no gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation and immediately after the exchange such person or persons are in control of the corporation. Petitioner and a majority of the bondholders, in 1933, transferred their bonds to the committee; but they remained the equitable owners of them. When, in 1934, the committee transferred the property and bonds held by it in trust for the bondholders, to the new corporation in exchange for all its stock, the committee held such stock as trustees for the bondholders and they, through their trustees, were in control of the new corporation. The plan contemplated that the stock of the new corporation would be "distributed or exchanged * * * pro rata among the depositing bondholders", and this was subsequently carried out. It seems clear, therefore, that the exchange in 1934 came squarely within section 112 (b) (5) and hence no gain or loss is to be recognized.

At first blush it might seem, inasmuch as petitioner determined in 1934 that the debt represented by the bonds was partially worthless and charged off a portion of his investment in such bonds, that the amount should be allowed as a deduction from his gross income. But not so. His investment in 1934 was that of an equitable owner in the property held by the committee as trustee for him and the other bondholders. We have no evidence from which we can determine the value of such ownership or his aliquot part in it; but we are satisfied that it, even in 1934, had a greater value than he would have us ascribe to it. Clearly it had at least as much value as a similar amount of bonds owned by a nondepositing bondholder. Such bondholders realized, during 1934, more than 12½ percent of their investment. If petitioner had kept his bonds and hence had been a nondepositing holder, he would not have sustained a loss equivalent to that which he charged off. But he did not do so. He participated in the reorganization and exchanged his bonds for stock of the new corporation. It is obvious that he and the other bondholders represented by the committee felt, and we believe justifiably, that in so doing they would be able to minimize, if not entirely eradicate, their loss; for the reorganized Lithograph Co. was given the option of purchasing, for $500,000, the property which the committee had bid in for $75,250. In addition, the property had been leased to the reorganized company at $10,000 for the first year, $15,000 plus current taxes for the second year, with the option of extending the lease for three years at a rental of $25,000 for the third year and $30,000 for each of the fourth and fifth years, and the first year's rent had been paid.

The new company had also acquired the second parcel of Ohio property prior to the end of 1934 and a mortgage note in the face amount of $13,000, secured by a first mortgage on a residence in Lakewood, Ohio, all for $30,000, the deposited bonds having been applied in part payment thereof. This property was leased for a period of five years, ending April 30, 1940, at an annual rental of $7,500 for each of the first two years, $8,000 for the third year and $9,000 for the fourth and fifth years, with the option to the lessee of renewing the lease for an additional period of five years at a rental to be agreed upon, but not to exceed $12,000, and to purchase the property at an amount equal to ten times the annual rental then current. The committee and the new company also had a substantial interest, as the holder of 97 percent of the outstanding bonds, in the property located in New York.

In a letter written by the committee to the depositing bond-holders under date of October 1, 1936, it was stated that the new corporation then had on hand the following cash and properties:

1. Cash $37,640.63.

2. The Payne Avenue property, leased to Morgan Lithograph Corporation.

3. The East 30th Street property leased to Bonnar-Vawter Fanform Company, Inc.

4. A purchase money note in the face amount of $60,000 executed by Morgan Lithograph Corporation, secured by a chattel mortgage on equipment and machinery sold to that corporation and located in the Payne Avenue plant, Cleveland, Ohio.

5. A bond in the face amount of $30,000 executed by Laundered Service, Inc., secured by a purchase money mortgage on the Elmhurst, New York, Property, the unpaid balance of principal upon which is $29,500.

6. A defaulted note in the face amount of $13,000 secured by a first mortgage on a dwelling on West 117th Street in Lakewood, Ohio, upon which foreclosure proceedings are pending.

The total amount of the indebtedness of the new corporation was stated to be not in excess of $11,500. In that year petitioner received a cash dividend of $100 upon his stock in the corporation.

While the value of petitioner's interest in the corporation in 1936 is no criterion by which the value of such interest in 1934 can be determined, it is nevertheless obvious, even if the situation as it existed in 1936 be ignored, that such interest had a value greater than that reported by him. If, therefore, we are in error in concluding that section 112 (b) (3) or (b) (5) precludes the allowance of the claimed deduction, the deficiency determined by the Commissioner must be approved for failure of the petitioner to establish the portion of the debt which was worthless.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*