COMMISSIONER OF INTERNAL REVE-
NUE v. CEMENT INVESTORS, Inc.

No. 2270.

Circuit Court of Appeals, Tenth Circuit.

July 24, 1941.

■■■■■■■■■
■■■■■■■

Arthur A. Armstrong, Sp. Asst. to the Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key and Samuel H. Levy, Sp. Assts. to the Atty. Gen., on the brief), for petitioner.

James B. Grant, of Denver, Colo. (Lewis & Grant, and Stephen H. Hart, all of Denver, Colo., on the brief), for respondent.

Before PHILLIPS, HUXMAN, and MURRAH, Circuit Judges.

PHILLIPS, Circuit Judge.

The Colorado Industrial Company[1] was a corporation organized under the laws of Colorado. On August 1, 1904, Industrial issued its five per cent first mortgage bonds[2] due August 1, 1934, and secured by a deed of trust on its property. The total face value of Industrial's bonds held by the public on August 1, 1934, was $27,633,000.

The Colorado Fuel and Iron Company[3] was a corporation organized under the laws of Colorado. It was engaged in the manufacture and sale of iron and steel products. It owned all the capital stock of Industrial consisting of 200 shares, and had unconditionally guaranteed both the principal and interest of Industrial's bonds. On August 1, 1933, Industrial was not engaged in any active business and had no assets of any substantial value, having transferred substantially all of its assets to the Colorado Company in 1913.

On August 1, 1933, Industrial and the Colorado Company defaulted in the payment of the annual interest due on Industrial's bonds.

On August 1, 1933, the stock and securities of the Colorado Company outstanding in the hands of the public were its general mortgage five per cent bonds[4] of the face value of $4,500,000, secured by a mortgage on its property, 20,000 shares of eight per cent cumulative preferred stock, each of the par value of $100, and 340,505 shares of common stock, of no par value. Dividends were not paid on the preferred stock after November 25, 1931. On August 1, 1933, the Colorado Company defaulted in the payment of the semiannual interest due on the general bonds. On that date, a receiver for the property of the Colorado Company was appointed by the District Courts of the United States for the Districts of Colorado and Wyoming.

On August 1, 1934, Industrial and the Colorado Company, both being in default in the payment of the principal and interest due on Industrial's bonds, filed petitions for reorganization in the District Court of the United States for the District of Colorado under § 77B of the Bankruptcy Act, 11 U.S.C.A. § 207. The petitions were approved and Arthur Roeder was appointed trustee.

On August 1, 1936, Cement Investors, Inc.,[5] a corporation organized under the laws of Delaware, owned Industrial's bonds of the face value of $44,000.

On March 12, 1935, a plan of reorganization was filed in the bankruptcy proceedings. It provided for the organization of the Colorado Fuel and Iron Corporation,[6] authorized to issue 1,000,000 shares of stock without par value and five per cent income mortgage bonds[7] of the face value of $11,053,200. It further provided that the Colorado Corporation should assume the payment of the general bonds which were not disturbed in the reorganization;[8] that all of the income bonds and 552,660 shares of the capital stock of the Colorado Corporation should be issued in exchange for the defaulted Industrial's bonds in the ratio of $400 face value of income bonds and 20 shares of stock for each $1,000 face value of Industrial's bonds. The plan declared that it gave the entire ownership and control of the Colorado Corporation to the Industrial bondholders. It recognized no present equity in the stockholders. However, it made provision for them to regain an equity by providing that warrants should be issued to the holders of preferred and common stock of the Colorado Company entitling them to purchase, on or before February 1, 1950, common stock in the Colorado Corporation at $35 per share in the

[1] Hereinafter called Industrial.
[2] Hereinafter called Industrial's bonds.
[3] Hereinafter called the Colorado Company.
[4] Hereinafter called general bonds.
[5] Hereinafter called the taxpayer.
[6] Hereinafter called the Colorado Corporation.
[7] Hereinafter called income bonds.
[8] Under order of the court the past-due interest and current interest on the general bonds had been paid by the trustee.

following ratios: For each share of Colorado Company preferred three shares of Colorado Corporation and for each share of Colorado Company common three-fourths of one share of Colorado Corporation. The subscription price was considerably higher than the open market price for the shares of the Colorado Corporation at the date of the consummation of the plan. The plan was duly accepted by the bondholders and shareholders of Industrial and the Colorado Company. On April 25, 1936, the court entered its order confirming the plan of reorganization. In the order the court found that Industrial and the Colorado Company had been in default on Industrial's bonds since August 1, 1934, and since that date had been unable to meet their debts as they matured, and that the plan was fair and equitable and did not discriminate unfairly in favor of any class of creditors or stockholders.

The Colorado Corporation was organized pursuant to the plan and on June 20, 1936, the court entered its order directing that on July 1, 1936, the Colorado Company, Industrial, the reorganization trustee of both, and the New York Trust Company, as trustee under Industrial's mortgage, should convey all their right, title, and interest in all of the assets of the Colorado Company and Industrial to the Colorado Corporation, and that the income bonds and 552,660 shares of the Colorado Corporation should be distributed to the holders of Industrial's bonds in exchange therefor. All of such assets were transferred to the Colorado Corporation and its bonds and stock were issued to the holders of Industrial's bonds in exchange therefor. The taxpayer surrendered Industrial's bonds of the face value of $44,000 in exchange for $17,600 face value income bonds and 880 shares of the Colorado Corporation.

The 552,660 shares of the Colorado Corporation were issued to holders of Industrial's bonds in exchange therefor. No stock was issued to parties other than holders of Industrial's bonds until October 23, 1936, and by June 30, 1938, only 465 shares had been issued to holders of warrants.

The capital stock of Industrial was cancelled and the mortgage securing the Industrial bonds was satisfied and discharged.

The warrants provided that the holders thereof should have no voting rights or other rights whatsoever as stockholders of the Colorado Corporation.

The fair market value of new securities received by the taxpayer was $37,884, exceeding the cost basis of its Industrial's bonds by $22,990.75.

The Commissioner determined deficiencies aggregating $16,985.03. The taxpayer admitted liability for $2,559.02. On petition for redetermination, the Board found a deficiency in the latter amount and entered its order accordingly.

This is a petition to review the order of the Board.

The pertinent statutes are set out in the margin.[9]

---

[9] Section 112 of the Revenue Act of 1936, 49 Stat. 1678, 26 U.S.C.A.Int.Rev. Acts, page 855, in part reads as follows:

"(b) * * * (3) Stock for stock on reorganization. No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization. * * *

"(5) Transfer to corporation controlled by transferor. No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange. * * *

"(g) Definition of reorganization. As used in this section and section 113—

"(1) The term 'reorganization' means * * * (C) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred * * *.

"(2) The term 'a party to a reorganization' includes a corporation resulting from a reorganization and includes both corporations in the case of a reorganization resulting from the acquisition by one corporation of stock or properties of another.

"(h) Definition of control. As used in this section the term 'control' means the ownership of stock possessing at least 80

■ The elements which constitute a nontaxable exchange under § 112(b) (5) are that

(a) Property

(b) Be transferred to a corporation

(c) Solely in exchange for stock or securities in such corporation, and that

(d) The transferors immediately after the exchange be in control of the corporation, through ownership of 80 per cent of all voting stock and at least 80 per cent of all other classes of stock of the corporation.

Under § 112(b) (5), a reorganization is not an essential element.[10]

■■ Both Industrial and the Colorado Company, as guarantor, had defaulted in the payment of the interest and principal of Industrial's bonds. The defaults had not been cured, and neither Industrial nor the Colorado Company was able to cure them. There was no equity in the properties over and above the bonded debts secured by Industrial's mortgage and the Colorado Company's mortgage. The holders of Industrial's bonds were entitled to a satisfaction of their indebtedness from the mortgaged property, or a statutory substitute therefor under § 77B. They had acquired equitable rights in the property and were entitled to have it disposed of under a plan, fair and equitable to them. On the approval of the petitions under § 77B, the property of Industrial and the Colorado Company came under the jurisdiction of the bankruptcy court and private rights in respect to the res became subject to the superior dominion of the court and were to be adjudicated pursuant to the standards prescribed in § 77B.[11] Since no equity remained in the properties for the preferred and common stockholders, the properties passed under the jurisdiction of the court empowered to make fair and equitable disposition thereof for the benefit of the bondholders. In the exercise of that jurisdiction the bankruptcy court ordered the equitable rights and interests of the bondholders in the properties to be transferred to the Colorado Corporation in exchange for stock and bonds of that corporation. Pursuant to the order, all of the assets of Industrial and the Colorado Company were transferred to the Colorado Corporation. In substance, Industrial's bondholders were the transferors.

Furthermore, the bonds of Industrial were property in the hands of the holders thereof[12] and they were transferred to the Colorado Corporation in exchange for all of the voting stock thereof, and under the plan no additional stock was to be presently issued. The warrants gave no rights to the holders thereof to vote or otherwise exercise the rights of stockholders.

■ Hence, property was transferred to the Colorado Corporation solely in exchange for stock and securities of such corporation and immediately after the transfer the bondholders, the transferors, were in control of the Colorado Corporation, owning all of its stock, and no gain or loss should be recognized by reason of the provisions of § 112(b) (5).

■ Moreover, we think, as the Board held, there was a reorganization within the meaning of § 112(g) (1), and hence, under § 112(b) (3) no gain or loss should be recognized.

The elements required by § 112(g) (1) (C) are: (1) that there be a transfer by a corporation of all or a part of its assets to another corporation, and (2) that immediately after the transfer the transferor or its stockholders, or both, be in control of the corporation to which the assets were transferred.

The assets of both Industrial and the Colorado Company were transferred to the Colorado Corporation. Immediately after

per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation."

[10] Portland Oil Company v. Commissioner, 1 Cir., 109 F.2d 479, 489; Hartford-Empire Company v. Commissioner, 43 B.T.A. 113; Leckie v. Commissioner, 37 B.T.A. 252, 257; Handbird Holding Corporation v. Commissioner, 32 B.T.A. 238, 247.

[11] Case v. Los Angeles Lumber Products Company, 308 U.S. 106, 125, 60 S. Ct. 1, 84 L.Ed. 110.

[12] Leckie v. Commissioner, 37 B.T.A. 252, 257; Rockford Brick & Tile Co. v. Commissioner, 31 B.T.A. 537; Miller & Paine v. Commissioner, 42 B.T.A. 586; Portland Oil Company v. Commissioner, 1 Cir., 109 F.2d 479, 488; P. A. Birren & Son v. Commissioner, 7 Cir., 116 F.2d 718, 719. See, also, Helvering, Commissioner, v. New Haven & S. L. R. Co., 2 Cir., 121 F.2d 985, decided July 16, 1941; Id., 41 B.T.A. 1340.

the transfer, the bondholders of Industrial were in control of Colorado Corporation, since all the capital stock of the latter to be presently issued was delivered to them in exchange for Industrial's bonds. The court order of June 20, 1936, directed the transfer of the assets and the issuance of the securities of the Colorado Corporation, and stated that the provisions thereof should constitute "a single and entire order and direction."

Substantially all the assets of Industrial which were subject to the lien of the mortgage securing Industrial's bonds had been transferred to the Colorado Corporation and the latter had unconditionally guaranteed the principal and interest of the bonds. Industrial and the Colorado Company had been in default as to the interest on the bonds since 1933 and as to the principal thereof since 1934, and were unable to cure the defaults. No equity remained in the property for the preferred or common stockholders. Industrial bondholders were entitled to have the property subjected to the payment of their bonds or to an equitable substitute therefor under the provisions of § 77B. The bondholders had an equitable right in the property and the stockholders had lost their equity therein. From a realistic point of view, the bondholders had supplanted the stockholders and were equitably entitled to have the property of Industrial and the Colorado Company disposed of for their benefit. We think, therefore, that the bondholders may be regarded as stockholders of Industrial and the Colorado Company. Such was the holding in Commissioner v. Kitselman, 7 Cir.,

89 F.2d 458, certiorari denied, Kitselman v. Helvering, 302 U.S. 709, 58 S.Ct. 29, 82 L.Ed. 548.[13]

Furthermore, for the reasons heretofore indicated, the Industrial bondholders, in reality, were the transferors of the properties transferred to the Colorado Corporation.

In either event, regarding them either as stockholders or transferors, immediately after the transfer they were in control of the Colorado Corporation, to which the assets had been transferred, owning all of the presently issued stock of the Colorado Corporation and entitled to exercise all the voting rights of the stockholders of the Colorado Corporation.

We accordingly conclude the decision of the Board of Tax Appeals was right and it is affirmed.

HUXMAN, Circuit Judge (concurring specially).

It is my conclusion that the transaction falls within Sec. 112(b) (5) and is therefore exempt. The bondholders did transfer property to the new corporation in exchange for its securities and they were in charge of the new corporation immediately after the exchange. Sec. 112(b) (5) therefore exempts them from the duty of reporting the transaction for income tax purposes at this time.

I cannot agree with the conclusion of the majority that the transaction is covered by Sec. 112(g) (1), Sec. 112(b) (3), and Sec. 112(g) (1) (C). In my view, neither the insolvency of the corporation, the deprecia-

13 The rationale of the Kitselman case has been followed in the following decisions: Commissioner v. Newberry L. & C. Co., 6 Cir., 94 F.2d 447, 449; Commissioner v. Southwest Consolidated Corporation, 5 Cir., 119 F.2d 561, 563; Commissioner v. Alabama Asphaltic Limestone Co., 5 Cir., 119 F.2d 819, decided May 5, 1941; Rex Mfg. Co. v. Commissioner, 7 Cir., 102 F.2d 325, 329; Leckie v. Commissioner, 37 B.T.A. 252, 256; Greenwood v. Commissioner, 41 B.T.A. 664, 668; Howard Hotel Corporation v. Commissioner, 39 B.T.A. 1147, 1153; Helvering, Commissioner, v. New Haven & S. L. R. Co., 2 Cir., 121 F.2d 985, decided July 16, 1941.

LeTulle v. Scofield, 308 U.S. 415, 60 S. Ct. 313, 84 L.Ed. 355, and Helvering v. Tyng, 308 U.S. 527, 60 S.Ct. 378, 84 L. Ed. 445, are clearly distinguishable. In the former, LeTulle was the sole stockholder in the Gulf Coast Irrigation Company. All of its properties were transferred to the Gulf Coast Water Company. LeTulle received cash and bonds, but no stock in the Water Company. Hence, he became a mere creditor of the Water Company and retained no stake in the enterprise. See Commissioner v. Southwest Consolidated Corporation, 5 Cir., 119 F.2d 561, 563, and Commissioner v. New Haven & S. L. R. Co., supra.

In the Tyng case, the owners of stock in one corporation transferred their stock to another corporation in exchange for cash and gold debenture and gold debenture bonds. Here again, stockholders of the old corporation became creditors of the new corporation and retained no stake in the enterprise. For the facts in the Tyng case, see Commissioner v. Tyng, 2 Cir., 106 F.2d 55.

tion of its assets to the point where they are insufficient to pay its obligations, nor even the fact that there is nothing left for the stockholders, results in a metamorphosis which changes a bondholder into a stockholder. Neither can I agree with the reasoning in Commissioner v. Kitselman. If it ever was the law, in my opinion it was overruled by the rationale of LeTulle v. Scofield, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355.