WILLIAM O. GAY *vs.* BURGESS MILLS.

DECEMBER 27, 1909.

PRESENT: Dubois, C. J., Blodgett, Johnson, Parkhurst, and Sweetland, JJ.

(1) *Convertible Bonds. Stockholders. Equity.*

A local manufacturing corporation with an authorized capital of $1,000,000, divided into 10,000 shares of the par value of $100, having sold $600,000 of its stock, issued 400 bonds, each for $1,000, secured by mortgage of all its real estate and machinery. The bonds provided that "The holder has the right, within the period of three years from the date, to surrender this bond and to receive 10 shares of the capital stock of the par value of $100 each. The mortgage contained a similar covenant and, also "that during the said period of three years its capital stock shall not exceed one million dollars." Owing to financial difficulties, the company reduced its capital stock to $10,-000, by reduction of the par value of each share from $100 to $1, and then raised it to $1,000,000, consisting of one million shares each of the par value of $1. This new stock was then offered to the old stockholders in proportion to their holdings, and with the exception of a few shares all the old stock was surrendered and the sum of $594,000 was paid in cash by the stockholders in return, for which the new stock was issued to them at par.

The directors then declared a dividend from the "surplus" of fifty per cent. on the outstanding capital stock, payable five per cent. semi-annually during a period of five years, with the provision that in case of insolvency, bankruptcy, or other winding up of the business before the expiration of the payments of such dividend, the whole of such dividend should fall due but should be payable from the assets, only after the general unsecured creditors should be paid in full, but it should be paid before the stockholders participated in any distribution of the assets.

Bill in equity by certain bondholders alleged that the greater part of the "surplus" was in lands, buildings, machinery, etc., and a part of the permanent capital; that this action, if valid, created an indebtedness which, with other indebtedness, made the debts exceed the capital stock actually paid in; that it sought to prefer the participating stockholders in liquidation to the bondholders; as well as to prefer the same stockholders both in dividends and assets as against the stock, which the bondholders were entitled to receive upon conversion of their bonds; and that the participating stockholders would get the surplus earnings, and the stockholders by conversion would be deprived of these earnings. They offered to convert their bonds and take stock if the dividend was set aside and they could have stock of the par value of $1,000 representing one one-thousandth of the entire capital stock carrying with it the rights of other stock, and asked that the action of the directors be declared null and void, for an injunction, and specific performance:

*Held,* that the bill would be dismissed, since the bondholders, as to the dividend declared prior to their election to become stockholders, were not entitled to the relief sought.

*Held,* further, that the dividend as declared did not operate to prefer the par-· ticipating stockholders to the bondholders, and no action of the directors could destroy the first lien upon real estate and machinery, which the bondholders had by virtue of the mortgage.

*Held,* further, that complainants by the tender in the bill waived their right to insist on ten shares, each of the par value of $100, for each bond.

When an option is given to take stock instead of receiving payment of a bond, even when embodied in the contract, it imposes no restriction on the obligor in regard to the issue of new stock, although the issue may be on such terms as to diminish the value of the right.

It is simply an option to take stock as the stock may turn out to be when the time for choice arrives. The bondholder does not become a stockholder by his contract, in equity, any more than at law.

BILL IN EQUITY seeking relief on facts fully set out in opinion. Heard on certification under C. P. A. § 338, and remanded with direction to dismiss.

BLODGETT, J. This is a bill in equity to enjoin the payment of a dividend, and was heard for final decree in the Superior Court for Providence county on bill, answer, replication, and proofs, and certified to this court for determination, under C. P. A. § 338.

The respondent is a Rhode Island manufacturing corporation, organized under the General Laws on July 31, 1906, with an authorized capital of one million dollars ($1,000,000), which was divided into ten thousand (10,000) shares of the par value of one hundred dollars ($100) each. It sold six hundred thousand dollars ($600,000) of its stock, but on account of the financial depression which culminated in 1907, it was unable to sell any more. This sum was insufficient to complete its plant. It therefore determined to issue four hundred (400) bonds, each for one thousand dollars ($1,000), secured by a mortgage of all its real estate and machinery then owned or thereafter acquired, and to that end, on February 5, 1907, it executed a mortgage to the Beacon Trust Company, of Boston, Mass., as trustee, to secure the payment of four hundred (400)

bonds of one thousand dollars ($1,000) each, and said bonds were immediately thereafter issued and sold.

Each bond provided that:

"The holder of this Bond has the right within the period of three years from the date hereof, on the first day of July or January in any of said three years, including the first day of January, 1910, to surrender this Bond at the office of the said Beacon Trust Company, in the said city of Boston, or at the office of the Burgess Mills, and to receive therefor Ten (10) shares of the Capital Stock of the Burgess Mills of the par value of $100 each."

The mortgage contained this covenant:

"The company" (Respondent) "will according to the tenor of the said Bonds within the period of three (3) years from the 1st day of January, A. D. 1907 on the first day of July or January in any of said three years (including the first day of January, A. D. 1910) deliver to any of said holders surrendering any of his said bonds and all unmatured coupons thereto belonging, a duly authorized certificate for Ten (10) shares of the Capital stock of said Burgess Mills for each Bond so surrendered, and that all Bonds and Coupons so surrendered shall be forthwith cancelled; and also that during the said period of three years its Capital Stock shall not exceed One Million Dollars ($1,000,000)."

The complainants allege that they are now, and have been since February 11, 1907, the holders of fifteen (15) of said bonds. Since the filing of the bill other bondholders, to the amount of $85,000 additional, have been made parties complainant.

The money secured by the sale of the bonds was not enough to finish the plant, purchase machinery, etc. The mill had borrowed all it could, and then had not enough money, and the fact that the plant was mortgaged caused the unsecured creditors to refuse to extend its credit further. At this point the directors had a meeting, and affairs were so serious that it was proposed to go into insolvency. Upon consulting counsel, it was found that the covenants in the mortgage prohibited the respondent from increasing its capital stock and that it was compelled to retain stock of the par value of $400,000 in the

treasury to meet the possible demands for conversion by the
bondholders.   It was suggested by counsel that the capital
stock be reduced to $10,000, by reduction of the par value of
each share from $100 to $1.00, and then that the capital stock
be raised to $1,000,000, consisting of 1,000,000 shares, each of
the par value of one dollar ($1).   The board of directors ap-
proved this plan, the stockholders duly ratified it, and the
capital stock was reduced and raised accordingly.   The new
stock was then offered to the old stockholders in proportion to
their holdings, upon surrender of the old certificates.   With
the exception of a comparatively few shares not material to the
decision of the question litigated in this case, all the old stock
was so surrendered, and the sum of $594,000 was paid in cash
by the stockholders, in return for which the new stock was
issued to them at par—excepting, as before, the few stock-
holders above mentioned.   This furnished the company with
money to finish the plant and for working capital, and rehabili-
tated the credit of the company.   The board of directors held
another meeting on June 25, 1909, and, conceiving that the
purpose of the second subscription by the stockholders had
been accomplished, at this meeting held on June 25, 1909,
passed a resolution declaring the dividend in question here, as
follows:

"Whereas, this corporation now has a surplus of more than
Three Hundred and Fifty Thousand Dollars ($350,000) over
and above its liabilities, and it is proper, right and equitable to
distribute a portion of said surplus among the present stock-
holders of this corporation, but it would be unwise to do so in
such manner as to injure the credit of this corporation; it is,
therefore, resolved that a dividend be declared from the sur-
plus of this corporation in words following, that is to say:

"The Burgess Mills, a corporation organized under the laws
of the State of Rhode Island, doing business in Pawtucket, in
the County of Providence, in said State, this 25th day of June,
A. D. 1909, hereby declares a dividend of 50% on the present
outstanding capital stock of the corporation, payable to the
shareholders of said corporation of record this date in manner
following:

"5 % on said outstanding capital stock on January 1st, 1910.

"5 % on said outstanding capital stock on July 1st, 1910.

"5% on said outstanding capital stock on January 1st, 1911.

"5% on said outstanding capital stock on July 1st, 1911.

"5% on said outstanding capital stock on January 1st, 1912.

"5% on said outstanding capital stock on July 1st, 1912.

"5% on said outstanding capital stock on January 1st, 1913.

"5% on said outstanding capital stock on July 1st, 1913.

"5% on said outstanding capital stock on January 1st, 1914.

"5% on said outstanding capital stock on July 1st, 1914.

"Provided, however, that the Board of Directors of said Burgess Mills shall have the power if they deem it necessary for the financial integrity of said corporation to postpone the due date of any instalment or instalments of said dividend to any date or dates they see fit, and they shall also have the power if they deem it for the advantage of the corporation to anticipate the due date of any instalment or instalments of said dividend; but such postponement or anticipation shall be by resolution of said Board of Directors, and shall be made before the instalment or instalments whose payment shall be postponed or anticipated fall due; but no interest shall in any event be payable on any instalment of said dividend until after the due date of said instalment, whether said due date be that above set out or that fixed by resolution of said Board in accordance herewith; and

"Provided, further, that in case of insolvency, bankruptcy or other winding up of the business of said Burgess Mills, before the expiration of the period of the payment of said dividend as above set forth, or as the same shall be payable by reason of the change of due date, by resolution of said Board of Directors in manner above set forth the whole of said dividend shall at once fall due, but shall be payable from the assets of said Burgess Mills only after the general unsecured creditors shall be paid in full, but it shall be paid before the shareholders of said Burgess Mills participate in any distribution of its assets."

The complainants aver that up to the time of the declaration

of the dividend the business had been conducted at a net loss of about $37,000; that the respondent had no surplus of earnings or profits on that date; that the surplus referred to was created by the reduction of its capital stock as aforesaid, which had not been accompanied by any actual withdrawal of the capital; that but a small part of the surplus was in cash, and that the rest was in lands, buildings, machinery, and stock manufactured or in process of manufacture, and it therefore became a part of the permanent capital of the company; that the action of the company attempted to create, and if valid, did create, an indebtedness to the amount of $300,000, which, added to its other indebtedness, made the amount of the debts, which the corporation then owed, exceed the amount of its capital stock actually paid in.

In the tenth and subsequent paragraphs of the bill, the complainants allege that the dividend as declared seeks to give to stockholders who participate in it a right, upon the winding up of the company, to appropriate part of the assets before they, as bondholders are paid in full; that it attempts to create a preference in favor of the same stockholders, both in dividends and assets, as against the stock which the bondholders are entitled to receive upon conversion of their bonds; that the old stock to which they were entitled had a par value of $100, and each bond could be converted for one one-thousandth of the actual capital authorized, whereas the new shares had only a par value of $1.00 each. They aver that they are entitled to receive for each bond, stock of the par value of $1,000, carrying with it all the rights of other stock to participate in the assets and earnings of the company, both as to dividends and in liquidation; that any attempt to abridge these rights is in violation of the covenants of the mortgage, and void as to the bondholders.

The complainants allege, also, that if the dividend is paid it will impair the capital or absorb the future earnings for many years to come; that the stockholders who take the dividend will get all the surplus earnings, and the stockholders by conversion will be deprived of these earnings. They aver, upon information and belief, that it was the purpose of the respondent's directors, by the declaration of said dividend, to deprive

the stockholders, who became such by conversion, of all benefit of future earnings until the dividend in question had been paid in full; that they did not know of the action of the directors until after July 1, 1909; that as long as the vote declaring the dividend remains in force they can not get such stock as they are entitled to on converting their bonds; that until the respondent's disability to comply with its covenants is removed they ought not to be affected by the expiration of the time originally fixed for the exercise of the privilege.

They offer to convert their bonds and take stock for them if the dividend is set aside, and they can have "stock of the par value of $1,000 representing one one-thousandth of the entire capital stock which said corporation is authorized to issue, carrying with it all the rights of other stock in said corporation to participate in its assets and earnings, both as to dividends and in liquidation for each bond with its unmatured coupons so converted."

They pray that the action reducing the capital stock and declaring the dividend be declared null and void; that an account of surplus and profits as of the 25th of June, 1909, be taken; for an injunction, and for specific performance of the covenants of the bonds.

The answer admits, *inter alia*, that the corporation holds stock in the treasury to answer the bonds, and that each stockholder is entitled to 1,000 shares of the new stock for each bond converted by him; it insists that the dividend was not in violation of the covenants of the mortgage, and that none but the stockholders of the date named in the declaration thereof are entitled to participate in it. It insists that the conversion right of bondholders be exercised in accordance with the terms of the mortgage and bonds, but not otherwise. It denies that any preference against the bondholders was intended, and avers that no such preference was created.

Many questions are raised by the pleadings, and have been discussed by counsel at great length, which we do not find it necessary now to determine, in view of the contention of the respondent that the option contained in the bonds does not entitle the complainants to question the action of the corporation

either at law or in equity.   We proceed, therefore, to a consideration of the nature and effect of this right of conversion, and of the rights and obligations respectively conferred and imposed upon the corporation and the bondholders as they have been determined in other jurisdictions.

In *Pratt* v. *American Bell Telephone Co.*, 141 Mass. 225 (1886), it appeared that the plaintiff "held certain notes with coupons attached, payable to the bearer thereof in three years after their date, issued by the defendant company on October 20, 1882. Each note contained this provision: ' The holder thereof may, on the twentieth of April, 1884, or on the twentieth of October, 1884, and at no other time, exchange this note, coupons not due being attached, for the stock of the company at par, that is, for one share.' At a meeting of the stockholders of the company held on March 27, 1883, it was voted to increase the capital stock, and the stockholders were given the right to take shares at par therein, in the proportion of one new share to three old shares held by them respectively.

" The bill alleges, that, at the time the convertible notes were issued, there was in the hands of the defendant trustees a sufficient amount of full paid stock of the company, subject to its control and not otherwise appropriated, to enable it to perform its contract to deliver stock for said notes, and that there was no other way in which the company could lawfully perform its contract than by the delivery of said shares so held by said trustees; that the vote to issue the notes and the issuing them was an appropriation of said stock to the fulfilment of said contract; and that the contract became in substance a contract to deliver said stock in exchange for said notes, and charged said stock in the hands of the trustees with a trust for the benefit of the holders of said notes.   The plaintiff, as the holder of a large number of these convertible notes, contends that he had the right to share on equitable terms in the benefit of the issue of said additional shares."   .   .   .

The court further says: "The plaintiff contends that the words 'stock of the company,' as used in the contract, have reference to the shares then held in trust for the company, and that the contract is to be construed as a contract to sell a speci-

fied portion of said shares; that, inasmuch as the parties must be presumed to have intended that which was legal rather than illegal, their contract will be construed accordingly; that the only possible legal contract was a contract to sell shares then owned by the company, and hence the presumption is that the company intended to contract to sell a given number of the shares of which it was the owner. The presumption is, without doubt, that the parties must have intended that which was legal rather than illegal, and their contract will be construed accordingly. But the presumption that the company intended to contract to sell a given number of the shares of which it was the owner when the contract was entered into does not necessarily follow. . . .

"A contract to sell shares owned by the company at the time the contract was made was not, as the plaintiff argues, the only possible legal contract. The party promising to deliver stock at a future time must, under the statute, be the owner or have the control of sufficient stock to fulfil his contract at the time the contract is made. It is not to sell the same shares, because the contract can be performed by the delivery of any other shares of the same stock. The presumption contended for by the plaintiff does not logically follow, that the company intended to contract to sell a given number of the shares of which it was the owner. The stock-jobbing act did not entitle the bearer of the convertible notes to receive any specific shares. Nor did it compel the company to tie up its shares, to keep them idle and useless during the three years, to await the uncertain option of the holder of the notes. The presumption seems to be contrary to that contended for by the plaintiff. The statute created no duty and no obligation on the part of the company in relation to the stock held by its trustees when this contract was made. It created no express or implied trust that the stock should be held to respond to the demands of the holders of these notes.

"The plaintiff argues, that, until the option was declared, the company was bound to keep itself in a position to carry out either of the promises contained in the notes, at the election of the holder. The contract does not make this requirement.

This case is not one where the option may be declared at any time, one where the company would be bound to hold itself in readiness to respond to the demand of the plaintiff every day and hour. It specifies two days when the exchange shall be made, and carefully states that at no other times, but upon those designated days can it be done.

"The plaintiff argues that the contract could not have been intended to refer to shares to be thereafter issued, since it was made by the directors of the company, and that they had no power to make issues of stock, that power belonging to the stockholders of the company, (Pub. Sts. c. 106. § 34,) and such new issue, if made, under the Pub. Sts. c. 105, § 20, could only be disposed of by offering it to previous stockholders. These propositions may be conceded. The statutes have carefully provided for the disposition of new stock, and have marked out the manner in which it shall be distributed. The contract could not have been intended to refer to such stock, upon the presumption that the parties must have intended that which is legal rather than illegal."

After thus fully stating the contention of the plaintiff, in conclusion the court decided: "In the case at bar, there was no appropriation of any specified stock to be used in fulfilling the contract named in the notes. At the time the notes were issued, the plaintiff was not a stockholder under the contract, nor was he such when the new stock was issued. The contract he had made obligated the company to pay him a certain sum of money at the expiration of three years, with interest, as appeared by the coupons attached to the notes, or to exchange his notes for the stock of the company upon certain dates. During the time the notes were running, he was in no sense a stockholder, nor do we find, upon the facts, that he was an equitable stockholder. He had no vested right or title in any particular stock. His rights and interest as a stockholder of the company were postponed to the time when he should make his option and demand his stock. Pending this time, the contract gave him the right to payment of the coupons attached to the notes, and nothing more. Whether he would ever acquire interest in the stock of the company under

his contract was conditional, and depended upon the event of his option, and until that was exercised he had no claim to any stock of the company. His contract did not attach to it the stock which the company held when the notes were issued. The convertible notes were independent of any particular, specified shares of stock, and the company held these shares free from any obligation expressed or implied in the contract. Each stood separate and alone, free from any rights or interests attaching the one to the other. The company could legally treat this stock as it saw fit. It could hold, sell, hypothecate, or lend it. Being subject to no trust, belonging absolutely to the company, it could hold and dispose of the same at its pleasure.

"We do not find that the contract contained in these convertible notes gave the plaintiff any equitable interest in the stock of the company, held by trustees for its benefit and disposal; and that, in holding said stock, neither the trustees who held it for the company, nor the company, were clothed with any trust for the plaintiff in relation thereto," and dismissed the bill.

In *Parkinson* v. *West End Street Railway Co.*, 173 Mass., 446, 448 (1899), in which case the bonds in question were originally issued by the Highland Street Railway, which was later consolidated with the Middlesex Street Railway, which latter company was in turn bought by the defendant, the West End Street Railway, the case of *Pratt* v. *American Bell Telephone Co., supra,* was affirmed and followed by Mr. Justice Holmes, who said: "When an option is given to take stock instead of receiving payment of a bond, the contract is not exactly what it was supposed to be in the argument for the plaintiff. Even when embodied in the contract, it imposes no restriction upon the obligor in regard to the issue of new stock, although the issue may be upon such terms as to diminish the value of the right. It leaves the management of the company in accordance with its other interests unhampered. It is simply an option to take stock as the stock may turn out to be when the time for choice arrives. The bondholder does not become a stockholder by his contract in equity any more than at law. *Pratt* v. *American*

*Bell Telephone Co.*, 141 Mass. 225.   So, if the corporation which made the bond finds it for its interest to go out of existence at or before the maturity of the obligation, the option given to the bondholder will not stand in the way.   The option gives him merely a *spes*, not an undertaking that the corporation will continue for the purpose of making it good.   This being so, we are not prepared to admit that, if the corporation should be dissolved at the time fixed for the bondholder's choice, he would be entitled to claim a proportionate share of the assets of the company.   We do not decide the question, but we do not think it clear that the contract operates except in the event of the corporation happening to remain a going concern, so that the promise can be fulfilled in a literal sense by the delivery of a certificate of stock."

*Pratt* v. *American Bell Telephone Co.*, *supra*, has also been cited and followed in the Federal courts.

In *Lisman* v. *Milwaukee, L. S. & W. Ry. Co.*, 161 Fed. Rep. 472 (1898), in which case the Chicago & Northwestern R. R. Co. had acquired all the stock of the Lake Shore Company and had paid for the same by exchanging its stock therefor at a fixed rate, no question was raised as to the liability to pay the bonds issued by the Lake Shore Company, but it was successfully contended that the plaintiff could not recover for a breach of the option of conversion into stock, the court saying: "Plaintiffs are the assignees of an executory contract which amounts to an irrevocable offer to exchange common stock for debenture bonds during a period of 20 years.   This contract, although appearing upon the face of the debenture, is in fact a separate independent agreement.   It is no part of the bond proper. Its purpose is not to secure the payment of money.   Its presence does not affect the negotiability of the bond.   *Hotchkiss* v. *Bank*, 21 Wall. (U S.) 354, 22 L. Ed. 645; *Welch* v. *Sage*, 47 N. Y. 143, 7 Am. Rep. 423.   Its invalidity would not impair the liability of the obligor to discharge the debt.   *Wood* v. *Whelen*, 93 Ill. 153.   It gains nothing in force by reason of its association with the stipulations of the bond.   It must be construed as though embodied in a separate writing.   It is not negotiable, and when it passes by assignment the assignee steps

into the shoes of the assignor. Being merely an unaccepted offer, it is strictly construed by the courts. . . . The same doctrine is announced in *Tagart* v. *Railway*, 29 Md. 557. It has several times been held, along the same line, that the holder of a convertible bond has no ground to complain of an increase of authorized capital stock, although such new issue may lessen or destroy the value of the option. *Pratt* v. *American Bell Telephone Co.*, 141 Mass. 225, 5 N. E. 307, 55 Am. Rep. 465. Upon such high authority it would appear that the Lake Shore Company might, in the interest of its stockholders, go out of existence without giving the holder of a convertible bond any just cause of complaint. . . . Under the reasoning of the cases cited, the option contract perished by operation of law before the Northwestern Company actually took over the management. Laying aside technical considerations, it must be apparent that all hope of speculative venture under the option was extinguished when the stock ceased to represent any value and had been withdrawn from the market; the stock certificates being stored away as a memento of a defunct enterprise." Concluding, on page 480, in further definition of the nature of such an option: "The holders of convertible bonds were not stockholders. They were creditors. They had neither a legal nor an equitable interest in the stock." See also *Welles* v. *Chicago and Northwestern R. R. Co.*, 163 Fed. Rep. (1908), p. 330; and *Sutliff* v. *Cleveland and Mahoning Railroad Co.*, 24 Ohio St. 147.

The doctrine announced in these cases is in accord with the decision of this court in *Union Screw Co.* v. *American Screw Co.*, 11 R. I. 569, affirmed, on rehearing, in 13 R. I. 673. In this case the plaintiff and defendant agreed, on March 28, 1867: the plaintiff to sell and the defendant to buy certain property; price to be determined by arbitrators; plaintiff to have the option to take payment in cash or in shares of the defendant, or partly in cash and partly in shares. The arbitrators were authorized to fix the value of the shares as of the date of the agreement, and were required to make their award within six months from that date. The agreement was to be carried into effect by transfer and payment within ten days after the award.

The award was made September 26. The value of the shares was fixed at $500 each, as of March 28th. Within ten days the plaintiff elected to be paid in stock, and the property was afterwards conveyed to the defendant. Between March 28th and the date of the conveyance of the property, the defendant made five dividends payable to its then shareholders of record. The last of these dividends was declared more than ten days after the award, to wit, on October 7, 1867. The plaintiff claimed it was entitled to the dividends declared during the existence of the agreement, but the court held that it was not, but was entitled to the dividend which was declared on October 7th, because on that date the plaintiff was entitled to the stock in question, it having previously elected to take stock. The court said (p. 572): "The plaintiff claims that after the agreement it was in equity the owner of the shares which it afterwards elected to take; the defendant being a trustee for it, and that therefore the dividends ought to have been withheld for it to participate in them. The claim rests on the maxim that equity considers as done what is agreed to be done. The maxim, however, is not to be taken so absolutely. The meaning of the maxim is explained by Story, who says 'All agreements are considered as performed, which are for a valuable consideration, in favor of persons entitled to insist on their performance. They are to be considered as done at the time when, according to the tenor thereof, they ought to have been performed.' Story's Eq., Juris. § 64-g. In the case at bar, the agreement was not to be performed until after the award, and therefore the plaintiff is not to be considered as owner, so as to be entitled to dividends, until after the award. . . .
The agreement, even as thus construed, strongly favored the plaintiff; for, if the stock fell, it could get its full pay by taking cash; if the stock rose, it could get more than its full pay by taking stock; if the stock neither fell nor rose, it would take either cash or stock, or both, as its judgment dictated. Can it be supposed that the plaintiff was to have still another and greater advantage? . . . Our conclusion is, that the dividends made prior to the expiration of ten days after the award and prior to the plaintiff's electing to be paid in stock, were

made lawfully and not in fraud of the agreement, and that the defendant is not accountable for them to the plaintiff."

We have cited at length from these adjudicated cases that it may more clearly appear that this option of conversion gives the complainant bondholders no ground of complaint, either at law or in equity, in respect of the matters alleged in the bill.

As to the complainants' claim that the dividend as declared seeks to give to stockholders, who participate in it, a right upon winding up of the company, to appropriate part of the assets before they, as bondholders are paid in full, we find no warrant for any such contention either in the form of the resolution or elsewhere in the record; it is quite plain that no such action of the directors could destroy the first lien upon real estate and machinery which the complainants, as bondholders, have by virtue of the mortgage.

We are of the opinion, moreover, that the complainants, by the tender contained in the bill, have waived their right to insist on ten shares, each of the par value of $100, for each such bond, and are entitled to receive, as the respondent is bound to deliver under its offer in the answer, 1,000 shares, each of the par value of one dollar in the event of the election by the bondholders to exercise their option of conversion on January 1, 1910. In either event the proportionate value of the stock is the same, and represents an identical aliquot part of the authorized capital stock.

We have not considered the technical objection to the prayer for specific performance contained in the bill, that there has been no demand and refusal, since that is not urged by the respondent; and in dismissing the complainants' bill we do so on the ground that the bondholders, as to the dividend declared prior to their election to become stockholders, are not equitably entitled to the relief sought.

Cause remanded to the Superior Court, with direction to enter its decree dismissing the bill.

*Edwards and Angell, Walter F. Angell,* for complainants.

*Richard B. Comstock, John E. Canning, Patrick P. Curran,* for respondent.

*Comstock and Canning,* of counsel.