HELVERING, COMMISSIONER OF INTERNAL REVENUE, *v.* SOUTHWEST CONSOLIDATED CORP.

No. 286. Argued January 14, 15, 1942.—Decided February 2, 1942.

*Assistant Attorney General Clark,* with whom *Solicitor General Fahy* and *Messrs. J. Louis Monarch* and *Samuel H. Levy* were on the brief, for petitioner.

*Mr. A. Chauncey Newlin,* with whom *Mr. Fred Simon* was on the brief, for respondent.

*Messrs. Walter J. Brobyn, Edgar J. Goodrich,* and *Neil Burkinshaw* filed a brief, as *amici curiae,* urging affirmance.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

The primary problem in this case is whether the transaction in question qualified as a "reorganization" under § 112 (g) (1) of the Revenue Act of 1934. 48 Stat. 680, 705. Sec. 112 (g) provides:

"As used in this section and section 113—

"(1) The term 'reorganization' means (A) a statutory merger or consolidation, or (B) the acquisition by one corporation in exchange solely for all or a part of its voting stock: of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation; or of substantially all the properties of another corporation, or (C) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (D) a recapitalization, or (E) a mere change in identity, form, or place of organization, however effected."

Respondent filed an income and excess profits tax return for a part of the year 1934 and for the entire year 1935, reporting a net loss for each year. Petitioner, in determining deficiencies, made certain adjustments on the theory that the acquisition by respondent in 1934 of all of the assets of its predecessor, Southwest Gas Utilities Corp., was not a "reorganization" as defined in § 112 (g) (1). The cost basis of the assets in the hands of the old corporation had been about $9,000,000. They were purchased at foreclosure and receivership sales for $752,000. Respondent used the former figure as the basis in computing gains and losses on the acquired assets. Thus it deducted some $75,000 as bad debts. Petitioner, in using the lower figure as the basis, allowed that deduction only to the extent of $1.26. Deficiencies computed on that theory showed a net income, rather than a net loss, for each year. The Board of Tax Appeals rejected the Commissioner's view.[1]

---

[1] The petition for review by the taxpayer contended that this transaction was a "reorganization" within the purview of § 112 (g) (1), and therefore that the carry-over basis provided in § 113 (a) (7) was applicable. No other issues were raised or considered by the Board or the court below. We pass only on that question, leaving open such other questions as may be appropriately presented to the Board.

The Circuit Court of Appeals affirmed the judgment of the Board. 119 F. 2d 561.

The old corporation was burdened with some $2,870,000 face amount of first lien bonds, certain unsecured claims, and issues of preferred and common stock. There was a default in interest on the bonds in May, 1932. A bondholders' committee was formed, which obtained the deposit of about 85% of the bonds outstanding. Members of the committee became directors of the old corporation and, beginning in the fall of 1932, were in control of it. In 1934, equity receivers were appointed by the Delaware chancery court. A plan of reorganization was formulated, which was approved by the court. The plan called for the formation of a new company which would acquire the assets of the old in exchange for voting common stock and Class A and Class B stock purchase warrants. Most of the common stock, issued under the plan, was to go to the bondholders; a small portion, together with the Class A warrants, was to be issued to the unsecured creditors. Class B warrants were to be issued to the preferred and common stockholders. Pursuant to the plan and a court order, the assets securing the bonds were sold by the indenture trustee at a foreclosure sale in 1934. They were bid in by the bondholders' committee for $660,000. The unpledged assets also were sold at public auction and were bought in by the committee for $92,000. Respondent was thereupon formed, and the committee transferred all the assets of the old corporation to it. The Board found that the fair market value of the assets at that time was $1,766,694.98. The stock and warrants of respondent were distributed pursuant to the plan. Non-participating security holders, owning $440,000 face amount of obligations, received about $106,680 in cash. The cash necessary to make this payment was obtained by a loan from a bank. The loan was assumed by the respondent and later repaid by it. About 49,300 shares of common

stock and 2,760 Class A warrants were issued to the cred-
itors; over 18,445 Class B warrants were issued to the
stockholders. Class A warrants carried the right to buy
one share of common stock at $6 a share during 1934, the
price being increased $1 per share each year until expira-
tion in 1938. Class B warrants carried the same right
except that the price was $10 a share during 1934 and was
increased by $5 per share each year until expiration in
1938. There were 1,760 Class A warrants and 4,623 of the
Class B warrants exercised. On the basis of the fair mar-
ket value of the assets at the time they were acquired in
the reorganization, respondent computes that the Class A
warrants had a value of $29 each and the Class B warrants
a value of $25 each.

Under the statute involved in *Helvering* v. *Alabama
Asphaltic Limestone Co., ante,* p. 179, there would have
been a "reorganization" here. For, the creditors of the
old company had acquired substantially the entire pro-
prietary interest of the old stockholders. See *Helvering*
v. *Minnesota Tea Co.,* 296 U. S. 378. But clause B of
§ 112 (g) (1) of the 1934 Act effects an important change
as respects transactions whereby one corporation acquires
substantially all of the assets of another. See S. Rep. No.
558, 73d Cong., 2d Sess., Committee Reports, Revenue
Acts 1913–1938, pp. 598–599. The continuity of interest
test is made much stricter. See Paul, Studies in Federal
Taxation (3d Series), pp. 36–41. Congress has provided
that the assets of the transferor corporation must be ac-
quired in exchange "solely" for "voting stock" of the trans-
feree. "Solely" leaves no leeway. Voting stock plus
some other consideration does not meet the statutory re-
quirement. See Hendricks, Developments in the Taxation
of Reorganizations, 34 Col. L. Rev. 1198, 1202–1203. Con-
gress, however, in 1939 amended clause B of § 112 (g) (1)
by adding, "but in determining whether the exchange is
solely for voting stock the assumption by the acquiring

corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded." 53 Stat. 871. That amendment was made to avoid the consequences of *United States* v. *Hendler*, 303 U. S. 564. See H. Rep. No. 855, 76th Cong., 1st Sess., pp. 18–20; S. Rep. No. 648, 76th Cong., 1st Sess., p. 3. And it was made retroactive so as to include the 1934 Act. 53 Stat. 872. But, with that exception, the requirements of § 112 (g) (1) (B) are not met if properties are acquired in exchange for a consideration other than, or in addition to, voting stock. Under that test, this transaction fails to qualify as a "reorganization" under clause B.

In the first place, security holders of the old company owning $440,000 face amount of obligations were paid off in cash. That cash was raised, during the reorganization, on a loan from a bank. Since that loan was assumed by respondent, it is argued that the requirement of clause B, as amended in 1939, was satisfied. But, in substance, the transaction was precisely the same as if respondent had paid cash plus voting stock for the properties. We search the legislative history of the 1939 amendment in vain for any indication that it was designed to do more than to alter the rule of the *Hendler* case. That case dealt with a situation where an indebtedness which antedated the transaction in question was assumed by the transferee. There the debt assumed clearly was a "liability of the other" corporation. The situation here is quite different. The rights of the security holders against the old corporation were drastically altered by the sale made pursuant to the plan. The sale not only removed the lien from the property and altered the rights of security holders in it; it also limited and defined the rights of the individual creditors if they elected to take cash rather than participate in the plan. See Weiner, Conflicting Functions of the Upset Price, 27 Col. L. Rev. 132, 137–138. In *Helvering* v. *Alabama Asphaltic Limestone Co., supra,*

*ante,* p. 179, we regarded the several steps in a reorganization as mere "intermediate procedural devices utilized to enable the new corporation to acquire all the assets of the old one pursuant to a single reorganization plan." Under that approach, part of the consideration which respondent paid for the properties of its predecessor was cash in the amount of about $106,680. The fact that it was paid to the bank, rather than to the old corporation or its creditors, is immaterial. The requirement to pay cash arose out of the reorganization itself. It derived, as did the requirement to pay stock, from the plan pursuant to which the properties were acquired. It was a necessary incident of the court decree which wiped out the liability of the old corporation and substituted another one in its place. Though the liability assumed had its origin in obligations of the transferor, its nature and amount were determined and fixed in the reorganization. It therefore cannot be labelled as an obligation of the "other" or predecessor corporation within the meaning of the 1939 amendment. Nor can the property be said to have been acquired "subject to" that liability within the purview of that amendment. The words "subject to" normally connote, in legal parlance, an absence of personal obligation. That seems to be the case here, for the preceding clause of the amendment covers the case of "assumption."

In the second place, the warrants which were issued were not "voting stock." Whatever rights a warrant holder may have "to require the obligor corporation to maintain the integrity of the shares" covered by the warrants (see Berle, Studies in the Law of Corporation Finance (1928), pp. 136–142), he is not a shareholder. *Gay* v. *Burgess Mills,* 30 R. I. 231, 74 A. 714. Cf. *Miles* v. *Safe Deposit Co.,* 259 U. S. 247, 252. His rights are wholly contractual. As stated by Holmes, J., in *Parkinson* v. *West End Street Ry. Co.,* 173 Mass. 446, 448, 53 N. E. 891, 892, he "does not become a stockholder by his contract in

equity any more than at law." At times, his right may expire on the consolidation of the obligor corporation with another. *Id.* If, at the time he exercises his right, there are no authorized and unissued shares to satisfy his demand, he will get damages, not specific performance. *Bratten* v. *Catawissa Railroad Co.*, 211 Pa. 21, 60 A. 319. And see *Van Allen* v. *Illinois Central R. Co.*, 7 Bosw. 515. Thus, he does not have, and may never acquire, any legal or equitable rights in shares of stock. *Lisman* v. *Milwaukee, L. S. & W. Ry. Co.*, 161 F. 472, 480, aff'd 170 F. 1020. And he cannot assert the rights of a shareholder. See Hills, Convertible Securities, 19 Calif. L. Rev. 1, 4. Accordingly, the acquisition in this case was not made "solely" for voting stock.[2] And it makes no difference that, in the long run, the unexercised warrants expired and nothing but voting stock was outstanding. The critical time is the date of the exchange. In that posture of the case, it is no different than if other convertible securities had been issued, all of which had been converted within the conversion period.

Nor can this transaction qualify as a "reorganization" under clause C of § 112 (g) (1). That clause requires that, "immediately after the transfer," the "transferor or its stockholders or both" be in "control" of the transferee corporation. "Control" is defined in § 112 (h) as "the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation." Here, "control" at the critical date was not in the old corporation or its "stockholders." The participating creditors had received, pursuant to the plan, rights to receive over a majority of the stock of the new company, even though all of the war-

---

[2] The contrary view expressed in a letter by the Commissioner, dated January 27, 1937 (1937 C. C. H. Vol. 3, Par. 6118), does not have the status of a formal ruling of the Treasury, nor does it seem to reflect an established course of administrative construction.

rants allocated to stockholders had been issued and exercised. The contrary conclusion was reached in *Commissioner* v. *Cement Investors, Inc.*, 122 F. 2d 380, 384,[*] on the theory that the bondholders of the insolvent predecessor company could be regarded as its "stockholders" within the meaning of § 112 (g) (1) (C), since they had acquired an equitable interest in the property and were empowered to supplant the stockholders. We have adopted that theory in *Helvering* v. *Alabama Asphaltic Limestone Co.*, *supra*, in determining whether the bondholders had retained a sufficient continuity in interest so as to bring the transaction within the statutory definition of merger or consolidation contained in the revenue acts prior to 1934. But it is one thing to say that the bondholders "stepped into the shoes of the old stockholders" so as to acquire the proprietary interest in the insolvent company. It is quite another to say that they were the "stockholders" of the old company within the purview of clause C. In the latter, Congress was describing an existing, specified class of security holders of the transferor corporation. That class, as we have seen, received a participation in the plan of reorganization. For purposes of clause C, they must be counted in determining where "control" over the new company lay. They cannot be treated under clause C as something other than "stockholders" of the old company merely because they acquired a minority interest in the new one. Indeed, clause C contemplates that the old corporation or its stockholders, rather than its creditors, shall be in the dominant position of "control" immediately after the transfer, and not excluded or relegated to a minority position. Plainly, the normal pattern of insolvency reorganization does not fit its requirements.

Clause D is likewise inapplicable. There was not that reshuffling of a capital structure, within the framework of an existing corporation, contemplated by the term "recapitalization." And a transaction which shifts the owner-

[*] No. 644, 316 U. S. 527.

ship of the proprietary interest in a corporation is hardly "a mere change in identity, form, or place of organization" within the meaning of clause E.

*Reversed.*

MR. JUSTICE ROBERTS did not participate in the consideration or decision of this case.