MAHLON D. THATCHER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

ADA T. HUNTZINGER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

LYDIA T. WHEELER, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 101598, 101599, 103219, 103220. Promulgated April 7, 1942.

---

*Richard F. Barrett, Esq.*, and *Egbert Robertson, Esq.*, for the petitioners.

*Leonard A. Spalding, Jr., Esq.*, for the respondent.

OPINION.

TURNER: The question raised by the first issue is whether there should be excluded from gross income of the petitioners the installment payments received by them under the insurance policies described in our findings. This is a question of law and involves the interpretation of sections 22 (b) (1) of the Revenue Acts of 1934, 1936, and 1938, which are identical and read as follows:

SEC. 22. GROSS INCOME.

\* \* \* \* \* \* \*

(b) EXCLUSIONS FROM GROSS INCOME.—The following items shall not be included in gross income and shall be exempt from taxation under this title:

(1) LIFE INSURANCE.—Amounts received under a life insurance contract paid by reason of the death of the insured, whether in a single sum or otherwise (but if such amounts are held by the insurer under an agreement to pay interest thereon, the interest payments shall be included in gross income).

Applying article 22 (b) (1)–1 of Regulations 86, the respondent, in determining the deficiencies here involved, has included in the income of the petitioners for the years before us the full amount of the installments received in those years under the insurance contracts above described. In support of such action, he states that these petitioners, prior to the years in question, had received in the aggregate amounts equal to or in excess of the amounts that would have been payable under contracts providing for the payment of insurance proceeds to beneficiaries in a lump sum at the death of the insured but in all other respects identical with the contracts before us, and that all amounts received in excess of the lump sum which would have been payable at the death of the insured had the contracts so provided constitute income. On brief, he makes an elaborate argument to the effect that since insurance companies, in arriving at the amount of the installments payable under contracts providing for such payment of the insurance proceeds, apply a percentage rate

to the amount that would have been payable had the contract provided for payment in a lump sum at the death of the insured, therefore the pro rata part of each installment attributable to such percentage rate represents interest and the remainder principal. Regardless of such argument, however, he still contends for the conclusion that the full amount of the installments received by these petitioners in the years here involved is income.

This same question was considered by us in *Sidney W. Winslow, Jr.*, 39 B. T. A. 373, and we there sustained the petitioner's contention that annual installments of life insurance received by the beneficiary after the death of the insured were excluded from gross income by section 22 (b) (1), *supra*. In the opinion of that case we reviewed the legislative and judicial history of the statute and concluded that the respondent's interpretation thereof, as set forth in his regulation, could not be sustained. Our decision was affirmed by the United States Circuit Court of Appeals for the First Circuit, *Commissioner* v. *Winslow*, 113 Fed. (2d) 418. There the court likewise held that the respondent's regulation above mentioned was contrary to the expressed intention of Congress and was invalid. Shortly thereafter the same conclusion was reached by the United States Circuit Court of Appeals for the Second Circuit, *Commissioner* v. *Bartlett*, 113 Fed. (2d) 766. To the same effect is *Commissioner* v. *Buck*, 120 Fed. (2d) 775, decided since the hearing in this proceeding.

The respondent concedes that in the cases above cited the taxpayers successfully challenged the validity of the regulation on which he relies, but argues that those cases are distinguishable and, further, that in so far as they deny his contentions they are erroneous. He fails to point out any material distinction, however, and, in view of the decisions cited above, further and extended discussion here seems to us unnecessary. We accordingly hold that the installment payments received by the petitioners under the seven insurance contracts are to be excluded from their gross income under section 22 (b) (1), *supra*. Cf. *Equitable Life Assurance Society of the United States*, 44 B. T. A. 293.

The question raised by the second issue is whether the exchanges by petitioners Thatcher and Huntzinger in 1929 and 1930 of their Washington stock for stock of the North American Co. were made in pursuance of a plan of reorganization and the stock exchanged and the stock received were the stock of corporations parties to the reorganization. If so, the basis of the North American stock in the hands of the petitioners was the same as the basis of their Washington stock. Sec. 113 (a) (6), Revenue Act of 1928. In section 112 (b) (3) it is provided that "No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or

securities in such corporation or in another corporation a party to the reorganization." In section 112 (i) (1) (A) of the Revenue Act of 1928 it is provided that the term "reorganization" means "a merger or consolidation (including the acquisition by one corporation of at least a majority of the voting stock and at least a majority of the total number of shares of all other classes of stock of another corporation * * *)." It is the contention of the petitioners that the transactions whereby they exchanged their Washington shares for North American shares was not an exchange within the meaning of section 112 (b) (3), but was an exchange in respect of which the gain was recognized and that the basis of the North American stock to them for the purpose of determining gain or loss was therefore its fair market value when acquired.

The exchanges of the Washington stock for North American stock were made pursuant to the offer contained in the letter dated July 3, 1939, by North American to the common stockholders of Washington. At or prior to that date North American was the owner of 73,324¾ shares, or 48.8 percent of all the Washington stock outstanding, all of such outstanding stock being voting stock. Washington had nothing to do with the offer and was not a party thereto. No change in either Washington or North American or in their business operations other than the acquisition by North American of additional common stock of Washington was contemplated or made. As the result of the offer and in accordance with its terms, North American by August 17, 1929, had acquired 6,128 additional shares of common stock of Washington and it thereafter directly owned a majority of the voting stock and a majority of the total number of shares of all classes of Washington stock then outstanding.

It is the contention of the respondent that these facts make of the transaction a reorganization within the meaning of section 112 (i) (1) (A), *supra*, and bring the exchange by the petitioners of their Washington shares for North American shares within the provisions of section 112 (b) (3). He relies particularly on *Rawco, Inc., Ltd.*, 37 B. T. A. 128, and *Commissioner* v. *Dana*, 103 Fed. (2d) 359. In the instant case the facts in our opinion not only fail to show the existence of a plan of reorganization, but to the contrary indicate the absence of one. North American was already the owner of 48.8 percent of the entire outstanding stock of Washington, which stock had been acquired by it for cash, and the only plan involved in the offer of July 3, 1929, was the plan to acquire such additional shares of Washington's common stock as might be offered in exchange for North American common stock. Furthermore, even though it be assumed that a plan to acquire additional common shares of Washington, under the facts and circumstances outlined, did constitute a plan of reorganization within the meaning of section 112 (i) (1) (A),

*supra,* there is no basis of fact whatever for any conclusion that Washington was a party to such plan. The factual situations in *Rawco, Inc., Ltd., supra,* and *Commissioner* v. *Dana, supra,* are entirely different and amply distinguish those cases from the instant case. Cf. *Cushman Motor Works,* 44 B. T. A. 1288; *Huey & Philp Hardware Co.,* 40 B. T. A. 781; and *Robert A. Pulfer,* 43 B. T. A. 677. We accordingly conclude that the exchange by the petitioners of their Washington shares for North American shares in 1929 and 1930 did not fall within the provisions of section 112 (b) (3), *supra,* and under the statute the gain realized from such exchange was recognizable.

The respondent pleads, however, that in any event petitioners are estopped to claim as the basis for the North American stock its fair market value at the time of acquisition. On brief, he states that he is not contending that petitioners are estopped within the usual confines of the doctrine of estoppel, but is contending, citing *Stearns Co.* v. *United States,* 291 U. S. 54, that petitioners, having taken the position in the earlier years that the exchanges of their Washington stock for North American stock were nontaxable, may not now change their position to the detriment of the revenue. He admits that there was no misrepresentation or deception practiced upon him, but contends that this matter was not brought to his attention prior to the running of the statute of limitations on the years in which the exchanges were made.

This latter contention of the respondent seems contrary to the stipulated facts. It has been stipulated that in 1931 an examining agent of the Commissioner made an examination of the books and records of petitioner Thatcher for the year 1929 and "in his examination checked the North American Company common stock ledger account of the petitioner" in connection with a sale of such stock in 1929, and in his report dated May 12, 1931, stated that "He maintains a complete set of books which were checked." In computing his gain on the 1929 sale of North American stock petitioner Thatcher used as a basis therefor his cost of the Washington stock which had been exchanged therefor. It is also stipulated that in 1932 the same examining agent made an examination of the books and records of petitioner Huntzinger for the year 1930, the year in which she acquired the North American stock, and she was later notified that, subject to approval in Washington, her return for 1930 was being accepted as correct. We do not know the details of the respondent's examination, but it can not now be said that the transactions in the prior years were not called to his attention.

The question of estoppel was considered and discussed at some length in *Tide Water Oil Co.,* 29 B. T. A. 1208, and *American Light & Traction Co.,* 42 B. T. A. 1121; affd., 125 Fed. (2d) 365. In the latter case the respondent advanced without success the same conten-

tions which he now advances in the instant case. We do not think that case can be satisfactorily distinguished from the instant case. Since the respondent had knowledge of the transactions in the prior years and concedes that no misrepresentation or deception was practiced upon him, we find no basis for his plea of estoppel.

Petitioner Thatcher mailed his Washington stock certificates to the depository on July 13, 1929, and petitioner Huntzinger mailed her certificates on July 19, 1930. The North American certificates were received by Thatcher on August 6, 1929, and by petitioner Huntzinger on August 2, 1930. The petitioners contend that the basic dates, for purposes of valuing the North American stock, were the respective dates on which they received their stock certificates. We do not think so. The basic dates for valuing the stock were the dates on which they were entitled to receive the stock and not the dates on which the certificates were delivered to them. *Anita Owens Hoffer*, 24 B. T. A. 22. *Stanton* v. *Commissioner*, 98 Fed. (2d) 739, relied on by petitioners, is clearly distinguishable. On the basis of the record here, we conclude that they were entitled to receive such stock on the dates that they accepted the offer made by North American, that is, the dates on which they mailed their Washington stock certificates to the depository.

The question raised by the last issue is whether the transaction whereby petitioners Thatcher and Huntzinger exchanged their stock in the American-La France & Foamite Corporation for stock and warrants in American-La France-Foamite Corporation, Inc., was a reorganization within the meaning of section 112 (g) of the Revenue Act of 1936.[1] The respondent contends that the transaction was a reorganization within the meaning of section 112 (g) (1) (C) and under section 112 (b) (3) of the act, the loss sustained by reason of such exchange is not to be recognized.

Petitioners contend that, since immediately after the transfer neither the transferor corporation nor its stockholders were in "control", section 112 (h),[2] of the new corporation, it was not a reorganization within the meaning of the act and that they are accordingly entitled to deduct the losses sustained.

Since the filing of briefs in this case, the Supreme Court has decided that bondholders of a transferring corporation can not, for the

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

    *       *       *       *       *       *       *

(g) DEFINITION OF REORGANIZATION.—As used in this section and section 113—

(1) The term "reorganization" means * * * (C) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred * * *.

[2] (h) DEFINITION OF CONTROL.—As used in this section the term "control" means the ownership of stock possessing at least 80 percentum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

purpose of satisfying the 80 percent control provision, be regarded as "stockholders". *Helvering* v. *Southwest Consolidated Corporation*, 315 U. S. 194. But, argues the respondent, here 2,500 shares of the new corporation were issued to noteholders of the old corporation who were also stockholders of the old corporation and when these 2,500 shares are added to those acquired by the other stockholders, then the 80 percent control requirement will be satisfied. The error in this argument is that such noteholders acquired the 2,500 shares of stock of the new corporation by exchanging their notes and not by reason of the fact that they also happened to be stockholders. This fact, in our opinion, is fatal to the respondent's contention. We hold that the transaction was not a reorganization within the meaning of the act and that petitioners are entitled to deduct the losses claimed.

Petitioner Thatcher now concedes that in 1935 and 1936 he received dividends on Northwestern Mutual Life Insurance policy No. 163,896 in the respective amounts of $156.31 and $52.32 and that, such amounts being in excess of the guaranteed installments payable under the policy, are includible in his taxable income for those years. Petitioner Huntzinger concedes that she similarly received during the years 1935, 1936, and 1937 the respective amounts of $156.44, $52.32, and $39.32 and that those amounts are includible in her taxable income for those years. Petitioner Wheeler also concedes that for the years 1936, 1937, and 1938 she received under the same policy payment of dividends in excess of the guaranteed installments payable thereunder and that such dividends are includible in her taxable income for said years.

*Decisions will be entered under Rule 50.*