SACRAMENTO MEDICO DENTAL BUILDING CO., A CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 102466.    Promulgated July 14, 1942.

*John C. Altman, Esq.,* and *Willard L. Ellis, Esq.,* for the peti-tioners.

*Harry R. Horrow, Esq.,* for the respondent.

OPINION.

Kern: The first issue for our determination is whether the petitioner corporation acquired the land and building pursuant to a plan of reorganization as that term is defined in section 112 (g) of the Revenue Act of 1934, thereby entitling petitioner to use as its basis for depreciation on the building, and fixtures the adjusted cost basis thereof to the old corporation.

Since the parties to this proceeding filed their briefs the Supreme Court has handed down five important opinions concerning "reorganizations." Those opinions are to be found in *Commissioner* v. *Alabama Asphaltic Limestone Co.*, 315 U. S. 179; *Palm Springs Holding Corporation* v. *Commissioner*, 315 U. S. 185; *Commissioner* v. *Southwest Consolidated Corporation*, 315 U. S. 194; and *Commissioner* v. *Marlborough Investment Co.*, 315 U. S. 189; and *Helvering* v. *Cement Investors, Inc.*, 316 U. S. 527.

Many of the contentions made by both parties to the instant controversy are considered in those cases and finally disposed of, and therefore it is unnecessary for us to consider them in this opinion.

It is obvious that if the transaction here in question is to be treated as a reorganization within the meaning of the statute, it must be by virtue of section 112 (g) (1) (B) of the Revenue Act of 1934.[1]

The transaction can not be considered a reorganization within the meaning of this section under the rule enunciated by the Supreme Court in the *Southwest Consolidated Corporation* case, *supra*. In addition to the voting stock (see *Federal Grain Corporation*, 18 B. T. A. 242), an amount of cash and bonds were also exchanged by the petitioner in return for the property acquired by it. The plan recognized the probability that there would be nondepositing bondholders. In fact, there were. According to the plan they were to be paid off by Santa Inez, which was to be repaid by petitioner. While this is the effect of what happened, the plan called for a series of intricate steps to bring about both the payment and repayment. Santa Inez paid the money to the committee, which paid it to Battson, the trustee under the original bond indenture, as part of the purchase price and he, in turn, paid it to the nondepositors. The repayment to Santa Inez was accomplished by the issuance of certain bonds by the new corporation in the face amount of $38,300 which Santa Inez was required to turn over immediately to the committee, the committee being required to pay Santa Inez therefor the sum of $16,950 ($9,185.38 of which represented the cash advanced by Santa Inez to pay off the nondepositors). The committee was then required to turn in these special bonds to the petitioner; they were to be immediately canceled; and the committee was to receive nothing in exchange therefor. In the *Southwest Consolidated Corporation* case certain security holders of the old corporation were paid off in cash, which was raised during the reorganization on a loan assumed by the respondent. The Court said:

* * * in substance the transaction was precisely the same as if respondent had paid cash plus voting stock for the properties. * * * The rights of security holders against the old corporation were drastically altered by the sale made pursuant to the plan. The sale not only removed the lien from the property and altered the rights of the security holders in it; it also limited and defined the rights of the individual creditors if they elected to take cash rather than participate in the plan. * * *

---

[1] SEC. 112. RECOGNITION OF GAIN OR LOSS.

* * * * * * *

(g) DEFINITION OF REORGANIZATION.—As used in this section and section 113—

(1) The term "reorganization" means (A) a statutory merger or consolidation, or (B) the acquisition by one corporation in exchange solely for all or a part of its voting stock: of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation; or of substantially all the properties of another corporation; * * *

Although Santa Inez was actually paid by the committee, the committee was acting as the agent of the petitioner and the petitioner stood behind the committee's obligation. The several steps were mere "intermediate procedural devices utilized to enable the new corporation to acquire all the assets of the old one pursuant to a single reorganization plan." *Commissioner* v. *Alabama Asphaltic Limestone Co., supra.* The fact that Santa Inez was one of the depositing bondholders rather than an outsider is immaterial. It can not be said that the assets of the old corporation were exchanged solely for voting stock, as required under clause B, and, therefore, we must conclude that the assets in question were not acquired under a tax free "reorganization" as that term is defined in section 112 (g).

It is, therefore, unnecessary to discuss the other contentions of respondent with regard to the same question.

Having concluded that petitioner did not acquire the assets in question as the result of a "reorganization" as that term is defined in section 112 (g) of the Revenue Act of 1934, we are now faced with the further issue of what basis to apply to the newly acquired property for depreciation or for gain or loss in the hands of the petitioner. The adjusted cost basis of the old corporation, which would have been the permissible basis only if we had concluded that the transaction was a "reorganization", may not be used by petitioner. Petitioner must be considered as having acquired the property from the bondholders' committee, which, in turn, had acquired it upon foreclosure. Upon the transfer of this property to petitioner by the committee, the depositing bondholders represented by the committee became entitled to voting trust certificates representing only 45 percent of the common stock of petitioner. The other 55 percent of the beneficial interest in the common stock was represented by voting trust certificates issued to the stockholders of the old corporation which had been placed in escrow and were subject to cancellation in the event defaults occurred under the deed of trust securing the bonds of the new corporation. Therefore, the transfer by the committee to petitioner was not one covered by section 112 (b) (5) of the Revenue Act of 1934,[2] since, by reason of section 112 (h),[3] the

[2] SEC. 112. RECOGNITION OF GAIN OR LOSS.

(b) EXCHANGES SOLELY IN KIND.—

(5) TRANSFER TO CORPORATION CONTROLLED BY TRANSFEROR.—No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; but in the case of an exchange by two or more persons this paragraph shall apply only if the amount of the stock and securities received by each is substantially in proportion to his interest in the property prior to the exchange.

[3] (h) DEFINITION OF CONTROL.—As used in this section the term "control" means the ownership of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of the corporation.

transferors were not in control of the transferee corporation immediately after the exchange.

Since no provision of section 112 is applicable, the basis of the property in the hands of petitioner corporation is the cost of such property to petitioner. Sec. 113 (a), Revenue Act of 1934. In return for the property acquired petitioner issued its promises to pay certain amounts, in the form of bonds. The face amount of the bonds issued by petitioner for the property in question must be considered as the cost of the property, since it represented the sum which petitioner was obligated to pay therefor. Cf. *Consolidated Coke Co.* v. *Commissioner*, 70 Fed. (2d) 446.

Although petitioner actually issued bonds in the amount of $400,000, the "plan" under which they were issued never contemplated that there would be more than $361,700 in bonds outstanding, and specific provision was made for the purchase by the committee from Santa Inez of $38,300 face amount of bonds and for their immediate retirement by petitioner without compensation. Consequently, we treat the transaction as one in which petitioner acquired certain assets in return for its bonds calling for the payment of the principal sum of $361,700.

Among the assets so acquired was certain cash. From petitioner's financial statement in evidence, it appears that the committee turned over to the petitioner $20,837.55, the balance of the cash in its hands. The portion of that $20,837,55 which was not used to pay current taxes already a liability at the time of the exchange must be considered as value received by petitioner in addition to the realty in exchange for the new bond issue. Real estate taxes in the amount of $7,719.20 for 1934–1935 were paid by the petitioner out of this $20,837.55. This amount appears to have been a tax lien against the property at the time of the exchange, and, therefore, the $7,719.20 will not be considered when computing the assets acquired in return for the bonds. Thus computed, petitioner, in return for its bonds in the face amount of $361,700, received cash in the sum of $13,118.35 and certain property. This property must therefore be considered as having been acquired at a cost of $348,581.65.

In allocating this cost between the depreciable building and fixtures on the one hand, and the land on the other, we shall use the only helpful figures on the matter which appear in the record—those having to do with fair market values as of 1934. Expert testimony was given that the fair market value of all of the property was $300,000, and that the value of the building and fixtures was $220,000. Applying the ratio of 220,000/300,000 established by this testimony to the total cost, we conclude that the cost which should be allocated to the building and fixtures was $255,626.54 and the cost to be allocated to the land was $92,955.11.

Since the facts indicate that a different rate is used in calculating the depreciation on the fixtures than that used in calculating the depreciation on the building, it becomes necessary to go one more step in allocating the cost—this time between the building and the fixtures. In determining a proper ratio to be used in this allocation, we resort to the figures showing cost to the old corporation. The depreciated cost of the building in the hands of the old corporation was $397,155.63, and the depreciated cost of the fixtures was $8,602.11. Applying the ratio of these figures to the sum of $255,626.54 (the cost we have allocated to both building and fixtures), we arrive at an allocation of $250,207.27 to petitioner's cost of the building and $5,419.27 to petitioner's cost of the fixtures. See *Texas Chemical Co.*, 11 B. T. A. 390.

Having determined that the basis to petitioner of the property acquired by it in return for its bonds was the face amount of such bonds less an amount equivalent to the cash received by it, there is no reason which seems to us persuasive to allow petitioner any amortization on account of discount. As we stated in *Southern Railway Co.*, 27 B. T. A. 673, 688, "The promise to pay a greater sum than the value of the property does not establish *ipso facto* the presence of discount in the transaction." As petitioner points out, if the basis for determining gain or loss upon the disposition of this property by petitioner had been held by us to be a sum considerably less than the face amount of the bonds issued by it in return for the property, as, for example, the amount bid for the property at the foreclosure sale or its fair market value at the time of such sale, then a strong argument might be made that inequities would result from the disallowance of discount amortization, since, upon a later disposition of the property for a sum equivalent to the face amount of the bonds, a fictitious profit would arise, which could only be offset by a previously allowed deduction on account of discount. However, in view of our decision that the basis of this property to petitioner is equivalent to the face amount of the bonds issued by it in return therefore, we do not have that question before us, and therefore, do not decide it. The basis of the property being as we have decided it to be, we conclude that, under the facts presented by the instant proceeding, petitioner did not issue its bonds at a discount and is, therefore, not entitled to any deduction on account of discount amortization.

Petitioner's contention that it realized no gain on the purchase and retirement of its bonds is conditioned upon our decision on the first two issues that (a) the basis of the property acquired by petitioner in 1934 was its then fair market value, or $300,000, and (b), petitioner is not entitled to deductions on account of a discount in the issuance of its bonds.

Our decision on the first issue, to the effect that the basis of the property acquired by petitioner is an amount equivalent to the face amount of the bonds issued by it for such property, makes this alternative contention of petitioner untenable. Therefore, we decide this issue for respondent.

Reviewed by the Board.

*Decision will be entered under Rule 50.*