**CIVIC CENTER FINANCE CO. v. KUHL.**

Civ. No. 4426.

United States District Court
E. D. Wisconsin.
Nov. 22, 1948.

Lecher, Michael, Spohn, Best & Friedrich and George D. Spohn, all of Milwaukee, Wis., for plaintiff.

Timothy T. Cronin, U. S. Atty. and E. J. Koelzer, Asst. U. S. Atty., both of Milwaukee, Wis., and Fred Neuland, Sp. Asst. to Atty. Gen., for defendant.

DUFFY, District Judge.

Plaintiff seeks to recover $12,795.86 paid as income tax and declared value excess profits tax for the calendar year 1942, plus interest from December 21, 1945. A timely claim for refund was filed and was disallowed by the Commissioner on December 3, 1946. The facts are not in dispute.

In 1926, Lodge 286 of the Loyal Order of Moose, Kenosha, Wisconsin, erected a clubhouse at a cost of approximately $250,000. To finance a part of the construction, the lodge issued $175,000 first mortgage bonds. Between 1926 and 1931 the outstanding bonds were reduced by serial retirements to $148,000. On and after June 1, 1931, the interest on the bonds was in default and foreclosure proceedings were commenced culminating in a judgment dated October 4, 1932, in the sum of $167,264.74, which was increased by subsequent

252

costs and interest to $186,714.57. A bond-holders' protective committee was organized which purchased the real estate at the sheriff's sale utilizing the bonds in part payment of purchase price.

On May 31, 1934, the bondholders' protective committee organized a corporation known as Civic Center Building, · Inc. (hereinafter called the "old company"). All of the stock of this company, consisting of 1,480 shares, was issued to the bondholders' protective committee in exchange for the real estate and improvements. The 1,480 shares were distributed to the holders of the $148,000 of bonds in the same proportion as the bonds were held.

The operation of the property by the old company was not successful. By the end of 1935 real estate taxes, plus interest thereon, were delinquent in the amount of $27,113.85 and there were other outstanding liabilities of $8,000. Kenosha County threatened to take title to the property if the outstanding taxes and interest were not paid by July 1, 1936. Unsuccessful efforts were made to refinance. Finally the directors of the old company decided to organize a new corporation which would purchase the property from it. On May 28, 1936, a plan of organization of the plaintiff was submitted to the stockholders of the old company, which plan was approved. The plan was outlined in a communication from the old company's directors to its stockholders, dated May 28; 1936, as follows:

"It is proposed to organize a new corporation under the laws of the State of Wisconsin, known as Civic Center Finance Co., with an authorized capital stock of $15,000, consisting of 150 shares at a par value of $100 per share. This new company will *purchase* the assets from the present Civic Center Building, Inc. and *payment* for the same will be made by having the new company assume the obligations of the present Civic Center Building, Inc., including taxes and other accounts payable. The new company will give back to Civic Center Building, Inc., a three-year *option* to repurchase the property at a sale price that will net the stockholders of the new company a profit of 100% plus 6% on their investment. The stock in the new

company will be *first* offered without preference to the present stockholders of Civic Center Building, Inc., and if the issue is oversubscribed the amount to be allotted each subscriber will be prorated on the basis of the present stock holdings. The plan contemplates that the *new company* shall use the cash derived from the sale of its stock, plus the proceeds of a first mortgage loan which is to be negotiated on the property in a sum sufficient to discharge the tax liens and thus prevent the County of Kenosha or anyone from acquiring title to the property through tax deed.

"In the event of a sale of the property before the expiration of the three-year option period the proceeds of the sale shall be used:

"First, to discharge any liabilities of the company then existing;

"Second, to pay off the holders of the stock of the new company on the aforementioned basis, i. e., a sum sufficient to return a 6% earning on their investment plus a 100% net profit and

"Third, the balance of the proceeds of such sale to be paid to the old company, Civic Center Building, Inc., for distribution among its shareholders.

"The completion of the plan, as it will effect (affect) those who do not subscribe for stock in the new company will be as follows:

"They will own stock in the present company, Civic Center Building, Inc., whose *only* asset will be a three-year option to repurchase the property;

"They will have the right to repurchase the property at any time during the three-year option period for a price that will net a 100% profit to the stockholders of the new company;

"They will be compelled to accept at the option of the new company during the three-year option period an amount equivalent to 20% of the face value of the Loyal Order of Moose Bonds exchanged by them for stock in Civic Center Building, Inc.

"Assuming that the plan is successfully completed so that sufficient money is raised by the sale of stock and by the negotiating of a first mortgage loan to pay all taxes on

the property, the stockholders of the new company will benefit as follows:

"They will acquire for less than $36,000 a building constructed in 1926 at a cost exceeding $250,000. The present physical value, based upon replacement cost, is $183,400; the economic value, based on income, is $71,600;

"They will be entitled to a profit of 100% on their investment plus 6% interest if the old company, Civic Center Building, Inc., repurchases the property under the terms of the three-year option;

"They will own the property absolutely at the expiration of three years *if* the old company does not repurchase at a price sufficient to net them 100% profit as hereinbefore mentioned;

"They will have the right, during the three-year option period, to sell the property at any price they approve, providing the stockholders of the old company are paid at least an amount equivalent to 20% of the face value of the Loyal Order of Moose Bonds exchanged by them for stock of Civic Center Building, Inc.

"The stock in the new company is to be non-assessable.

\* \* \* \* \* \*

" \* \* \* It is the plan to call for payment of subscriptions on June 15, 1936. \* \* \*

" \* \* \* If sufficient subscriptions are not obtained by June 8, the stock will then be offered to outsiders."

The plaintiff, Civic Center Finance Company, was organized as a Wisconsin corporation on May 27, 1936, with an authorized capital stock of $15,000 consisting of 150 shares of common stock having a par value of $100 per share. All of the stock of the new company was subscribed by persons owning a total of 565 shares out of a total of 1,480 shares of the old company. The subscriptions for stock were paid in cash.

Steps were then taken to effect the acquirement by plaintiff of the property in consideration of its assumption of the old company's obligations. A written contract between the old company and plaintiff was entered into on June 26, 1936. This provided that the old company convey by warranty deed to plaintiff the real estate and building in consideration of the plaintiff assuming all of the old company's outstanding debts, obligations and accounts payable, including taxes, all of which were stated in the agreement to amount to $34,-451.03. The agreement further provided for the conveyance by bill of sale of the old company's right, title and interest in and to the personal property, including furniture, fixtures and equipment. The agreement also contained an option for the old company to repurchase the real estate at any time within three years at a price sufficient to net the stockholders of plaintiff a 100% profit on their 150 shares of stock, plus 6% interest on the par value of said stock from the date of the agreement to the date of sale. Pursuant to said contract the plaintiff assumed the old company's liabilities, which in fact amounted to $35,651.03. The current assets acquired, other than the land, building and equipment, amounted to $1,682.81.

In September, 1936, a different option agreement was entered into by the old company and stockholders of plaintiff whereby the latter granted an option to the old company to purchase at any time prior to June 26, 1939, the 150 shares of common stock of plaintiff at a price of $200 per share. In this option the stockholders reserved to themselves all dividends declared and earnings accumulated during the term of the option. However, neither this option nor the option to purchase the real estate was ever exercised by the old company.

On May 21, 1942, plaintiff sold the real and personal property hereinbefore described, together with additional equipment acquired since June 26, 1936, for a gross sales price of $63,000. After allowance of $4,687.50 for leasehold payment credits and $2,571 for expenses of the sale, the net proceeds of the sale amounted to $55,741.50.

In its corporate income tax return for 1942 plaintiff reported a loss of $36,860 on the sale. The property had been carried on plaintiff's books on the same basis as previously carried by the old company, to wit: Land, $8,370, and Buildings, $97,-

020, which figures corresponded with the 1934 assessed valuation. In arriving at the loss reported in the income tax return plaintiff used as a basis the unadjusted cost of the properties as shown on its books.

Upon the audit of plaintiff's 1942 return the Commissioner of Internal Revenue determined that the unadjusted basis of the property sold by plaintiff was represented by the liabilities, expressed in dollars, assumed by plaintiff upon its acquisition of such properties in 1936, and after making adjustments for depreciation determined the plaintiff's basis to be $25,194.67, instead of $92,601.50, as claimed by plaintiff. The Commissioner determined that plaintiff had realized a taxable gain of $30,546.83 upon the sale. Corporate income taxes in the sum of $7,636.71 and declared excess profits tax in the sum of $3,349.06, together with interest in the sum of $1,810.09, aggregating $12,795.86, were then assessed against the plaintiff, which plaintiff paid to defendant on December 21, 1945.

The defendant contends that the plaintiff's unadjusted basis is represented by the total liabilities of the old company which were assumed by plaintiff, and that such basis is its "cost." Plaintiff contends (1) that the transaction between it and the old company on June 26, 1936, constituted a "reorganization" under Section 113(a) (7) of the Internal Revenue Code, 26 U.S. C.A. § 113(a) (7), and that its basis of the property is the same as it would be in the hands of the old company; (2) in the alternative, that the unadjusted basis for the property should be determined as a gift under Section 113(a) (2) of the Internal Revenue Code; and (3) as a second alternative, that such basis should be determined under Section 113(a) (8) of the Internal Revenue Code, as paid in surplus and contributions to capital.

The term "reorganization" as used in Section 113(a) (7) is defined by Section 112(g) (1) of the Revenue Act in effect in 1936, 26 U.S.C.A. § 112(g) (1) note, as follows:

"(g) Definition of reorganization. As used in this section and section 113—

"(1) The term 'reorganization' means (A) a statutory merger or consolidation, or (B) the acquisition by one corporation in exchange solely for all or a part of its voting stock: of at least 80 per centum of the voting stock and at least 80 per centum of the total number of shares of all other classes of stock of another corporation; or of substantially all the properties of another corporation, or (C) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, or (D) a recapitalization, or (E) a mere change in identity, form, or place of organization, however effected."

The particular provisions relied on as pertinent are: "(g) * * * (1) The term 'reorganization' means * * * (B) the acquisition by one corporation in exchange solely for all or a part of its voting stock * * * of substantially all the properties of another corporation, * * *."

It should be pointed out, however, that, while the statute in 1936 read "solely" for "voting stock," clause (B) of Section 112 (g) (1) was amended by adding, "* * * but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded; * * *."

This amendment, adopted in 1939, was made retroactive to include 1934 and subsequent Acts. 53 Stat. 871, 872. Clause (B) of Section 112(g) (1) must be read, therefore, as including such amendment in 1936, and as so amended is to be considered in the instant action.

■ In the transaction now under consideration no stock of plaintiff was exchanged for the property of the old company. The assumption of the old company's liabilities is not sufficient to qualify the transaction as a reorganization since under Clause (B) the issue of the voting stock in exchange is essential, in addition to and regardless of the assumption of liabilities. There is no evidentiary basis upon which to find that in the exchange any stock of the plaintiff passed to the old company or its stockholders as such. The fact is that a limited number of individuals subscribed

and paid for the stock of the new company. These individuals constituted about 40% in number of the old company's stockholders. The other 60% did not become stockholders because they did not subscribe and pay for the stock in the new company. As there was no continuity of interest in the exchange transaction between the plaintiff and the old company, it must be held that there was not a "reorganization" within the provisions of Section 113(a) (7).

This conclusion is in accord with the holding in Helvering v. Southwest Consolidated Corporation, 315 U.S. 194, at pages 198, 199, 62 S.Ct. 546, at page 550, 86 L.Ed. 789. The court there said: " * * * clause (B) of § 112(g) (1) of the 1934 Act effects an important change as respects transactions whereby one corporation acquires substantially all of the assets of another. * * * The continuity of interest test is made much stricter. See Paul, Studies in Federal Taxation (3d Series), pp. 36–41. Congress has provided that the assets of the transferor corporation must be acquired in exchange 'solely' for 'voting stock' of the transferee. 'Solely' leaves no leeway. Voting stock plus some other consideration does not meet the statutory requirement. * * * Congress, however, in 1939 amended clause (B) of § 112(g) (1) by adding, 'but in determining whether the exchange is solely for voting stock the assumption by the acquiring corporation of a liability of the other, or the fact that property acquired is subject to a liability, shall be disregarded.' 53 Stat. 871, 26 U.S.C.A.Int.Rev. Acts, page 1177. That amendment was made to avoid the consequences of United States v. Hendler, 303 U.S. 564, 58 S.Ct. 655, 82 L.Ed. 1018. * * * And it was made retroactive so as to include the 1934 Act. 53 Stat. 872, 26 U.S.C.A.Int.Rev. Acts, page 1178. But with that exception, the requirements of § 112(g) (1) (B) are not met if properties are acquired in exchange for a consideration other than, or in addition to, voting stock. Under that test this transaction fails to qualify as a 'reorganization, under clause (B)".

In Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, at page 182, 62 S.Ct. 540, at page 542, 86 L.Ed. 775, the rule was stated as follows:

"From the Pinellas case, Pinellas Ice & Cold Storage Co. v. Commission of Internal Revenue, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428, to the LeTulle case, LeTulle v. Scofield, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355, it has been recognized that a transaction may not qualify as a 'reorganization' under the various revenue acts though the literal language of the statute is satisfied. See Paul, Studies in Federal Taxation (3d Series), p. 91 et seq. The Pinellas case introduced the continuity of interest theory to eliminate those transactions which had 'no real semblance to a merger or consolidation,' 287 U.S. at page 470, 53 S.Ct. at page 260, 77 L.Ed. 428, and to avoid a construction which 'would make evasion of taxation very easy.' * * * Under that test there was 'no reorganization' in this case since the old stockholders were eliminated by the plan, no portion whatever of their proprietary interest being preserved for them in the new corporation. * * * *"

Treasury Regulations 101, Art. 112(g) (1), in force in 1936, is to the same effect and provides: " * * * The purpose of the reorganization provisions of the Act is to except from the general rule certain specifically described exchanges incident to such readjustments of corporate structures, made in one of the particular ways specified in the Act, as are required by business exigencies, and which effect only a readjustment of continuing interests in property under modified corporate forms. Requisite to a reorganization under the Act are a continuity of the business enterprise under the modified corporate form, and a continuity of interest therein on the part of those persons who were the owners of the enterprise prior to the reorganization. * * * *"

The plaintiff argues further that its acquisition of the old company's property also involved a "reorganization" under Section 112(g) (1) (C) of the Revenue Act of 1936, which defines such a reorganization as follows: "(g) * * * (1) The term 'reorganization' means * * * (C) a transfer by a corporation of all or a

part of its assets to another corporation if immediately after the transfer the transferor or its stockholders or both are in control of the corporation to which the assets are transferred, * * *."

As used in clause (C) the term "control" is defined in Section 112(h) of the Revenue Act of 1936, as follows: "As used in this section the term 'control' means the ownership of stock possessing at least 80 per centum of the total combined voting power of all classes of stock entitled to vote and at least 80 per centum of the total number of shares of all other classes of stock of the corporation."

The provisions of Treasury Regulations 101, Art. 112(g) (1) pertain to "reorganizations" generally, including those embraced in clause (C), and require that° in such a transfer there shall exist continuity of interest on the part of the transferor-corporation's stockholders. In Helvering v. Southwest Consolidated Corporation, supra, the court said, 315 U.S. at pages 201, 202, 62 S.Ct. at page 551, 86 L.Ed. 789: "Nor can this transaction qualify as a 'reorganization' under clause (C) of § 112(g) (1). * * * They (stockholders of the old company) cannot be treated under clause (C) as something other than 'stockholders' of the old company * * *. Indeed *clause (C) contemplates that the old corporation or its stockholders * * * shall be in the dominant position of 'control' immediately after the transfer and not excluded or relegated to a minority position.* * * *" (Italics supplied.)

As has been heretofore pointed out, the requisite continuity of interest on the part of the old company's stockholders as such in the transaction herein is absent. Plaintiff's contention cannot be sustained.

■ The plaintiff further contends that the transaction under review is tax free under Section 112(b) (5) of the Revenue Act of 1936. This section is extensively commented upon in Helvering v. Cement Investors, Inc., 316 U.S. 527, at page 533, et seq., 62 S.Ct. 1125, 86 L.Ed. 1649; and in Seiberling Rubber Co. v. Commissioner of Internal Revenue, 6 Cir., 169 F.2d 595, 602.

The section has no application to the transaction involved since the transfer of the old company's property was not made "solely in exchange for stock or securities" in the new company. The transfer was expressly made, completed and effectuated solely in consideration of the assumption by the new company of the old company's liabilities. The new company's issue of stock, which was brought about by voluntary individual subscriptions and payments by less than 40% of the old company's stockholders, was a matter specifically kept distinct and separate from the transfer of the property. This contention of plaintiff must be overruled.

■ The plaintiff makes a final contention in the alternative that the basis of the property is subject to determination as a gift under Section 113(a) (2) of the Internal Revenue Code, or classifiable under Section 113(a) (8) thereof, relating to paid in surplus and contributions to capital.

Clearly, Section 113(a) (2) has no application here since the property was not acquired by gift. It was acquired by the new company solely for the consideration expressed, viz., the assumption by it of the old company's liabilities.

The argument of plaintiff that Section 113(a) (8) applies has been carefully considered, but it would unduly extend this opinion to say more than it is not applicable to the facts involved in this case.

There was a correct determination of the new company's tax liability, and the defendant is entitled to judgment. dismissing the new company's complaint upon the entry of findings of fact and conclusions of law in conformity herewith. Counsel appearing on behalf of the defendant will prepare such findings and conclusions and submit same for settlement on five days' notice to counsel for plaintiff.