### FORREST HOTEL CORP. v. FLY.

#### Nos. 1327, 1600.

United States District Court
S. D. Mississippi, Jackson Division.
May 22, 1953.

783

Luther A. Smith, Hattiesburg, Miss., for plaintiff.

Joseph E. Brown, U. S. Atty., by Edwin R. Holmes, Jr., Asst. U. S. Atty., Jackson, Miss., for defendant.

THOMAS, District Judge.

### Statement of the Case

In these consolidated actions, Forrest Hotel Corporation, the plaintiff in both, seeks to recover against the government a refund for taxes alleged illegally collected by the defendant from the plaintiff.

The principal contention of the plaintiff is that the transaction, hereinafter specifically described, which occurred January 1, 1939, between Forrest Hotel Corporation and Maybar Corporation, was a sale or exchange and not a reorganization, merger or consolidation, under sections 112(b) (3), 112(g), and 113(a) (7) of the Internal Revenue Code; and hence plaintiff should be allowed to amortize the cost to it of acquiring through the transaction the leasehold interest of Maybar.

On March 21, 1949, plaintiff filed suit for refund of taxes alleged to have been illegally collected by the defendant from the plaintiff for the years 1942, 1943, and 1944, in the sum of $52,214.03, together with interest. On March 12, 1951, plaintiff filed a second suit, identical in form to the first but seeking a refund for taxes alleged illegally collected by the defendant from the plaintiff for the years 1945, 1946, and 1947. These consolidated actions present the same issues and were heard as one.

## Findings of Fact

### I

The Forrest Hotel Corporation was chartered under the laws of the State of Mississippi on September 26, 1928, with an authorized capital stock of $250,000, consisting of 2500 shares of seven percent cumulative preferred stock with a par value of $100 each and 5000 shares of common stock of no par value. Upon the payment of the par value of a share of preferred stock, there was also issued to the subscriber one share of common stock. At the time of its organization, the Forrest Hotel Corporation, hereinafter called Forrest, issued and sold 1987 shares of its preferred stock of the par value of $198,700, and also issued 1,987 shares of its common stock, for which it received no additional consideration. Soon after the incorporation of Forrest, there was organized under the laws of the State of Mississippi the Maybar Corporation, hereinafter called Maybar, with an authorized capital stock of $80,000, all of which was subscribed and paid for before Maybar began business.

### II

Forrest was organized primarily for the purpose of building a hotel in the City of Hattiesburg, Mississippi. After its organization, Forrest issued and sold bonds in the principal sum of $250,000, $100,000 of which were in serial bonds, $10,000 of which matured annually, the balance of $150,000 maturing January 1, 1939. With the proceeds of the sale of the $198,700 in stock and the $250,000 bond issue, Forrest constructed a hotel building in Hattiesburg, Mississippi; and on December 11, 1928, entered into a contract with Maybar, under the terms of which Maybar leased the building for a period of twenty years at an annual rental of approximately $40,000. Maybar equipped the hotel and gave a chattel mortgage to Forrest on this equipment to secure the performance of the lease. This lease and the chattel mortgage securing it were transferred by Forrest to the trustee under the bond mortgage as security for the payment of the bonds. Some of the stockholders of Forrest were also stockholders of Maybar.

### III

Maybar began the operation of the hotel under the lease contract, but in a short time it was found that this operation was unsuccessful, and Maybar began to default in the payment of the rentals due Forrest. As Forrest's only source of income was the rentals to be paid by Maybar, Forrest began to default in its obligations under the bond issue, so that in 1934 by agreement with the bondholders, the maturity date of all bonds was extended until January 1, 1939. The defaults by Maybar continued from year to year until January 1, 1939, at which time Maybar owed Forrest $148,014.16 in rentals. Substantially, the only property Maybar had with which to meet this obligation was the furniture, fixtures, and furnishings with which it equipped the hotel, and certain other assets of questionable value, all of which were carried on its books at a depreciated value of $38,300.52.

### IV

When Maybar began to default in the payment of its rental in 1932, Forrest each

year charged off the amount of the deficit, so that as of January 1, 1939, the books of Forrest showed a surplus deficit of $68,-542.28. Prior to January 1, 1939, the date of the maturity of all the bonds, various conferences were held between representatives of the bondholders, of Maybar, and of Forrest, in an effort to work out some plan by which the bonds could be extended and something salvaged for the stockholders of Forrest and Maybar. For various reasons, it was decided that it would not be wise for Forrest to foreclose its chattel mortgage and bring distress proceedings against Maybar.

## V

On January 1, 1939, a plan was finally worked out between the bondholders of Forrest and the representatives of the two companies. Payment of the bonds was extended for a period of years, the stockholders of Maybar transferred all of their stock to a trustee for Forrest, so that Forrest became the sole stockholder of Maybar. Forrest, in turn, issued to the individual stockholders of Maybar a total of $40,000 par value of the preferred stock authorized by its charter, which had not theretofore been issued, together with 400 shares of its common stock, likewise authorized by its charter, which had never theretofore been issued. This stock was issued to the Maybar shareholders in proportion to the stock previously owned by them in Maybar, so that for each share of Maybar, the stockholders of Maybar received one-half share of preferred and one-half share of common of Forrest. After this was done, Maybar conveyed all of its physical assets to Forrest, these assets having a net book value of $38,300.52. Forrest assumed and promptly satisfied the liabilities of Maybar, except the liability to itself in the amount of $148,014.16. Since the date of this transaction Maybar has been for all intents and purposes fully liquidated, having no assets or liabilities and not having functioned as a corporate entity.

## VI

Although the entire debt of Maybar to Forrest, aggregating $148,014.16 for unpaid rentals from 1932 through 1938, had been charged off the books of Forrest as bad debts from year to year, the entire charge-off had not been used as a deduction for tax purposes. The first charge-off was in 1932, amounting to $28,223.97; but as a result of this charge-off and its operations that year, Forrest sustained a loss of $17,-992.81, so that the amount of the charge-off used as a credit against tax liability was the difference, amounting to $10,231.16. Likewise, in 1933 the charge-off was $27,-530.29; but as a result of its operations and this charge-off, Forrest sustained a loss that year of $15,237.61, so that only the difference was used as a credit against tax liability, this difference being $12,292.68. Putting it in statement form for these years through 1938, the charge-offs and credits are as follows:

|  | Total Charge-off | Amount Used as Credit Against Tax Liability |
|---|---|---|
| 1932 | $ 28,223.97 | $10,231.16 |
| 1933 | 27,530.29 | 12,292.68 |
| 1934 | 30,164.39 | 13,721.28 |
| 1935 | 24,433.11 | 12,122.66 |
| 1936 | 15,247.66 | 15,247.66 |
| 1937 | 7,994.94 | 7,994.94 |
| 1938 | 14,419.90 | 14,419.90 |
|  | $148,014.16 | $86,030.18 |

The difference between the total charge-off and the amount used as a credit against tax liability is $61,983.98. In other words, in addition to the $40,000 of capital stock issued, Forrest forgave a debt due it, of which $61,983.98 had never been used by it as a credit against any tax liability.

## VII

The amount which Forrest now seeks to use as a credit against its tax liability for the years 1942 through 1947 includes this total charge-off of $148,014.16, and is computed as follows:

Liabilities of Maybar assumed
by Forrest      $154,905.73
(Including Rent Payable ..
$148,014.16)

| | |
|---|---|
| 400 Shares Preferred and 400 Shares Common Forrest stock paid to Maybar stockholders | 40,000.00 |
| Total Cost of Acquisition | $194,905.73 |
| Less: | |
| Assets of Maybar acquired by Forrest | 45,192.09 |
| Net Cost of Acquisition | $149,713.64 |

It is this $149,713.64 which Forrest claims was the cost to it of acquiring the lease, and which it seeks to amortize over the ten year period from 1939 to 1949.

### VIII

On December 31, 1938 and 1939, Forrest's bonds aggregating $150,000 were still outstanding and were not paid until May 27, 1942. The bonds and interest were paid by Forrest out of the earnings of the hotel after Forrest took over its operation from Maybar.

### IX

For the year 1939 and subsequent years, Forrest filed its returns and paid its taxes on the assumption and representation to the Commissioner that in 1939 there was a reorganization, merger, or consolidation by and between Forrest and Maybar under sections 112(b) (3), 112(g) and 113(a) (7) of the Internal Revenue Code. When the taxing authorities proposed to tax Forrest for the years 1939 and 1940 on the theory that the transaction in 1939 was a sale and exchange resulting in a substantial taxable gain, Forrest filed a protest and briefs urging that the transaction be considered a tax-free reorganization or merger and not a sale or exchange. Forrest's protest and briefs prevailed upon the Commissioner to treat the transaction as a tax-free reorganization or merger, and Forrest was not required to pay the proposed tax. Forrest, in making such representations, was not guilty of bad faith.

### X

If Forrest had not prevailed in its contention that the 1939 transaction was a tax-free reorganization and merger, and had the transaction been treated as a sale and exchange, the tax which Forrest would have been called upon to pay at that time would have amounted to $1,948.47, because of the low valuation put on the stock of Forrest by the agent of the Collector. This sum Forrest is now willing to pay.

### XI

By the terms of the lease, Forrest, as lessor, had the right to cancel the lease and reenter the premises within fifteen days from any default in payment.

### XII

As of January 1, 1939, Forrest had been in default in paying dividends on its preferred stock since December 31, 1931. The charter of Forrest provided that if at any time there should be a default in the payment of dividends on the preferred stock, the common stock should stand automatically canceled until this default had been restored and so long as the default existed the sole voting stock would be the preferred stock.

### XIII

Before the transaction of January 1, 1939, Maybar owned the furnishings et cetera, of the hotel; after, the Maybar stockholders had a 16.757 percent interest in the furnishings and also in the Forrest holdings, that is, the hotel building. Before the transaction, Forrest owned the building; after, Forrest owned an 83.243 percent interest in both furnishings and building.

### XIV

On January 1, 1939, the balance sheet of Maybar showed a capital deficit of $189,713.64. No value was set up on Maybar's books for the lease to Forrest. The Maybar stock had no market value; in fact, as far as the evidence shows, it was worthless.

### XV

The debt owed Forrest by Maybar was likewise worthless and had no value at the time of the alleged cancellation. Maybar was insolvent at the time its assets were transferred to plaintiff, and the indebtedness of approximately $148,000 owing plaintiff by it was not an additional consideration, as it had no value at that time.

## XVI

The shareholders of Maybar had their interests preserved by receiving stock of Forrest in the exact proportion to their interests formerly held in Maybar and were given a vote in the affairs of Forrest through the preferred stock held by them and through the common stock issued to them with the preferred, if common stock subsequently became the voting stock. Maybar retained a continuing proprietary interest and a substantial share in the continuing corporation, Forrest. None of the shareholders of Maybar failed to receive stock, or in any way had their interest eliminated, or even decreased, as a result of the transaction of January 1, 1939.

## XVII

After the transaction of January 1, 1939, the operation of the hotel by Forrest was very successful and profitable.

### Discussion

If the transaction of January 1, 1939, was a reorganization, then under section 122 of the Internal Revenue Code, no gain or loss to Forrest shall be recognized; if said transaction is a sale or exchange, the gain or loss to Forrest as a result thereof shall be recognized.

It is the contention of Forrest that the transaction of January 1, 1939, was not a reorganization, but a sale or exchange; that the cost of the acquisition and cancellation of the lease held by Maybar was $149,713.64; that Forrest should have been allowed to amortize this cost or purchase price over the ten-year period which the lease still had to run. In other words, it is claimed that one-tenth of the alleged cost, or about $15,000 should have been deducted from Forrest's annual income for the succeeding ten years beginning January 1, 1939.

Forrest further contends it was in error in not claiming a deduction for the years 1940 and 1941. Its right to make claim for refunds for these years, however, would be barred by the statute of limitations, 26 U.S. C.A. § 3772(a).

The government asserts as a defense to Forrest's claim (1) that Forrest, having contended the transaction of January 1, 1939, was a reorganization, merger, or consolidation, and having paid its taxes accordingly, is estopped by this election from claiming now that the transaction was a sale or purchase and not a tax-free reorganization; (2) that Forrest had treated the debt owed it by Maybar as worthless, and that, in fact, the debt had no value whatsoever at the time of the alleged cancellation; (3) that the cancellation of the debt was not a consideration for any part of the transaction.

Was the transaction of January 1, 1939, a tax-free merger or reorganization under sections 112(b) (3) and 112(g) of the Internal Revenue Code of 1938, as amended; or was it a sale or exchange as a result of which gain or loss must be recognized under section 111 of the Internal Revenue Code?

In exchange for each share of stock in Maybar, the stockholders of Maybar receive one-half share of preferred and one-half share of common stock of Forrest, which in effect also canceled an indebtedness of Maybar to Forrest. Maybar then conveyed all of its physical assets to Forrest, and Forrest assumed and paid all of the liabilities of Maybar other than the indebtedness to itself.

The component steps of a single transaction should not be treated separately. The legal consequence should be determined by the transaction as a whole. Heller v. Commissioner, 9 Cir., 1945, 147 F.2d 376; Payson v. Commissioner, 2 Cir., 1948, 166 F.2d 1008; A. C. Burton & Co. v. Commissioner, 5 Cir., 1951, 190 F.2d 115.

Does the transaction here comply with section 112(g) (1) (B) of the Internal Revenue Code? Specifically, were the assets of Maybar transferred in consideration "solely" for voting stock of Forrest?

According to Merten's Law of Federal Income Taxation, 1948 Ed., Section 20.49, the unwritten requirements of a reorganization are:

(1) Permanence—reshaping of existing corporate business for purpose of continuing that business in the new and changed form.

(2) Retention by the transferor corporation or its stockholders of a stake or interest in the reorganized corporate business in the form of stock therein.

(3) Representation through such stock of a substantial part of the value of the properties transferred to the new corporation; and

(4) Continuity of corporate business under changed form and not a complete withdrawal of certain assets from the corporation's business and distribution of same to its stockholders.

The element of continuity—present in all four of the above requirements—has been strictly construed by the courts so that a transaction may not qualify as a reorganization under the various revenue acts, though the literal language of the statute is satisfied, absent the element of continuity. Pinellas Ice & Cold Storage Co. v. Commissioner, 287 U.S. 462, 53 S.Ct. 257, 77 L.Ed. 428; LeTulle v. Scofield, 308 U.S. 415, 60 S.Ct. 313, 84 L.Ed. 355. "The Pinellas case introduced the continuity of interest theory to eliminate those transactions which had 'no real semblance to a merger or consolidation' (287 U.S. page 470 [53 S.Ct. 257 page 260]), and to avoid a construction which 'would make evasion of taxation very easy.'" Helvering v. Alabama Asphaltic Limestone Co., 315 U.S. 179, 62 S.Ct. 540, 543, 86 L.Ed. 775.

Mr. Justice Douglas in Helvering v. Southwest Consolidated Corporation, 315 U.S. 194, 198, 62 S.Ct. 546, 550, 86 L.Ed. 789, emphasized the strictness of application of the continuity requirement, "But clause (B) of § 112(g) (1) of the 1934 Act effects an important change as respects transactions whereby one corporation acquires substantially all of the assets of another. * * * The continuity of interest test is made much stricter. * * * Congress has provided that the assets of the transferor corporation must be acquired in exchange 'solely' for 'voting stock' of the transferee. 'Solely' leaves no leeway. Voting stock plus some other consideration does not meet the statutory requirement." The court went on to decide that voting stock and stock warrants

did not qualify as a reorganization, failing to meet the continuity of interest requirement. This ruling was applied in Civic Center Finance Co. v. Kuhl, D.C., 83 F. Supp. 251; Roebling v. Commissioner of Internal Revenue, 3 Cir., 143 F.2d 810; Central Kansas Telephone Co. v. Commissioner of Internal Revenue, 10 Cir., 141 F.2d 213; and other cases.

Article 112(g) (1), U. S. Treasury Department Regulations 101, Revenue Act of 1938, is as follows:

"* * * The purpose of the reorganization provisions of the Act is to exempt from the general rule certain specifically described exchanges incident to such readjustments of corporate structures made in one of the particular ways specified in the Act, as are required by business exigencies, and which effect only a readjustment of continuing interests in property under modified corporate forms. Requisite to a reorganization under the Act are a continuity of interest of the business enterprise under the modified corporate form, and a continuity of interest therein on the part of those persons who were the owners of the enterprise prior to the reorganization. * * *." See also 26 C.F.R. 29.-112(g)–1.

"The reorganization provisions were enacted to free from the imposition of an income tax purely 'paper profits or losses' wherein there is no realization of gain or loss in the business sense but merely the recasting of the same interests in a different form, the tax being postponed to a future date when a more tangible gain or loss is realized." Commissioner of Internal Revenue v. Gilmore's Estate, 3 Cir., 130 F.2d 791, 794.

The Supreme Court has not defined what is meant by a "definite and material * * * interest" or "a substantial part of the value of the thing transferred", which it considers necessary in order that the result may generally partake of the nature of merger or consolidation. Helvering v. Minnesota Tea Co., 296 U.S. 378, 56 S.Ct. 269, 272, 80 L.Ed. 284. But it has been held under a variety of circumstances that the retention of a substantial rather than controlling interest in the

transferee corporation is sufficient, as concerns a statutory reorganization. Adamston Flat Glass Co. v. Commissioner of Internal Revenue, 4 Cir., 162 F.2d 875.

■ The relationship of the merged or transferor corporation to the assets conveyed does not have to continue unchanged, and dissolution of the old corporation is not essential. Miller v. Commissioner of Internal Revenue, 6 Cir., 84 F.2d 415.

■ The test of continuity of interest, as stated by the Court of Appeals, 5th Circuit, is as follows: "(1) that the transferor corporation or its shareholders retained a substantial proprietary stake in the enterprise represented by a material interest in the affairs of the transferee corporation, and, (2) that such retained interest represents a substantial part of the value of the property transferred." Southwest Natural Gas Co. v. Commissioner of Internal Revenue, 189 F.2d 332, 334.

In applying the above principles to the instant case, "it is clear that each case must turn upon the true significance of the facts involved so that substance rather than form will prevail; and that if in any case a sale [reorganization] was actually intended and carried into effect, the transaction must be so regarded in whatever form it has been cast, * * *." Morgan Mfg. Co. v. Commissioner of Internal Revenue, 4 Cir., 124 F.2d 602, 605. (Brackets mine.)

Plaintiff contends that there was no reorganization under section 112(g) (1) (B) because Forrest issued one-half share of non-voting common stock with one-half share of voting preferred stock for the property of Maybar, and therefore the statutory requirement as to "solely for all or a part of its voting stock" was not met. In addition, plaintiff alleges that Forrest cancelled a valid debt for unpaid rent.

■ In my opinion, the answer to plaintiff's contention that both voting and non-voting stock was issued to Maybar stockholders, is, that under the fundamental provisions of plaintiff's charter, both preferred and common were voting stocks, and which happened to be the voting stock at a particular time was incidental. See Finding of Fact XII. The requirement "solely for

all or a part of its voting stock" is intended to rule out from the provisions of subsection (g)(1)(B) transactions in which there is an additional cash or other valuable consideration and to preserve the continuity of interest requirement which is here represented by two classes of stock, issued as a unit, to be voted in the alternative.

As to plaintiff's second contention that there was another consideration, namely, the cancellation of the $148,000 debt owed by Maybar to Forrest, I am of the opinion that the cancellation of this debt was not actually part of the consideration in this transaction. It should be here noted that the stock which Forrest gave to Maybar stockholders was approximately of the same book value as the assets of Maybar which Forrest received (not including any valuation for Maybar's interest in the lease). Maybar was broke, Forrest was in danger, and to say that the cancellation of this $148,000 indebtedness was additional consideration is to my mind nothing more than fiction. The relationship of this indebtedness to the value of the leasehold interest which Forrest seeks to amortize is further discussed below.

Returning to the stock transfer feature of the transaction, the shareholders of Maybar had their interests preserved by receiving stock of Forrest in the exact proportion to their interests formerly held in Maybar. The Maybar shareholders were given a voice in the affairs of Forrest through the preferred stock held by them; and when, under the charter, common became the voting stock, they would continue to have a part in the control of the affairs of Forrest. It must be noted, too, that some of the stockholders of Maybar were also stockholders of Forrest.

The stockholders of Maybar retained a continuing proprietary interest and a substantial stake in the continuing corporation, Forrest. It would be idle to contend that such retained interest did not represent a substantial part of the value of the property transferred. The stock of Maybar, representing its assets, was of no value; in exchange for Maybar's stock and assets, Maybar stockholders received stock of Forrest, a going concern. None

of the shareholders of Maybar failed to receive stock or in any way had their interest eliminated or even decreased as a result of the plan of reorganization.

■ Looking through the form of the transaction of January 1, 1939, and getting into the substance, it appears to me plainly that it was a merger or consolidation and nothing more.

## II

If I am wrong in this conclusion, and if the transaction of January 1, 1939, was, in fact, not a reorganization but a sale or exchange upon which gain or loss must be recognized, is plaintiff correct in its contention that it should be allowed, by virtue of section 23(a) (1) of the Internal Revenue Code and Article 109 of Treasury Regulations 45, to deduct as an exhaustible expenditure the $149,713.46, which it alleges was the cost to it of acquiring the rental contract held by Maybar?

Article 109 of Treasury Department Regulations 45 (under the Revenue Act of 1918) provides: "Where a leasehold is acquired for a specified sum, the purchaser may take as a deduction in his return an aliquot part of such sum each year, based on the number of years the lease has to run." See also 26 C.F.R. 29.23(a)-10(a), 1949 Ed.

■ Unquestionably, this is the generally accepted rule that an amount paid for acquisition and cancellation of a lease is in the nature of a capital expenditure to obtain possession during the unexpired term of the canceled lease, and is recoverable through annual deductions for depreciation spread over the unexpired term of the canceled lease. Wells Fargo Bank & Union Trust Co. v. Commissioner of Internal Revenue, 9 Cir., 163 F.2d 521; Harriet B. Borland v. C. I. R., 27 B.T.A. 538; Charles B. Bretzfelder v. C. I. R., 21 B.T.A. 789; Home Trust Co. v. Commissioner of Internal Revenue, 8 Cir., 65 F.2d 532, and cases cited; King Amusement Co. v. Commissioner of Internal Revenue, 6 Cir., 44 F.2d 709.

The theory for this deduction or amortization is that the amount paid by the lessor as consideration for the cancellation or the acquisition of a lease represents the cost to the lessor of acquiring a valuable property right, namely, the right to the re-possession, enjoyment, and use of his property for the remaining unexpired term of the lease. This theory and all the decisions based thereon presuppose that the lessor has actually given something of value in consideration for acquiring the leasehold interest, and that without this necessary actual expense, the lease could never have been secured.

In the King Amusement Co. case, supra, 44 F.2d at page 710, there appears the following: "The owner would not make the lease except upon a guaranty of the payment of the rent, and it became necessary for petitioner to pay Finsterwald and King $50,000 to become guarantors. * * It was * * an expenditure which it was necessary for petitioner to make to acquire property—a leasehold to use. * * *." See also Friend v. Commissioner of Internal Revenue, 7 Cir., 119 F.2d 959.

How can it be said that the $148,000 owed by Maybar to Forrest was a consideration and part of the purchase price in acquiring the lease from Maybar when, by the terms of the lease, Forrest could have stepped in and canceled the lease within fifteen days after Maybar defaulted, back in 1932?

■ Doubtless, Forrest showed excellent business judgment in not canceling the lease upon default by Maybar, but there is no evidence that Forrest had, of necessity, to cancel Maybar's debt to it in order to secure the lease. As I have stated before, at the time of the transaction, Maybar was broke. It owed Forrest $148,000, and other creditors about $7,000, and had some assets which had a book value of $38,000. Forrest could have terminated the lease pursuant to the terms thereof at any time within fifteen days after the first default in 1932, or at any time thereafter up to and including January 1, 1939. It is true this might have cost a small amount in attorney's fees and court costs, and would have been disastrous to the stockholders of Maybar. It is true,

too, that the bondholders of Forrest held the lease as part security for the debt on the hotel property. Nevertheless, I do not think it can now be said that Forrest acquired an intangible capital asset to be treated as an exhaustible expenditure on the theory that Maybar had an interest in the unused portion of the lease, which interest was acquired for a consideration of $149,713.64.

■ It seems to me apparent that the taxing question of this transaction was correctly handled in the first instance, and should not now be disturbed. In reaching this conclusion, I wish to state plainly that I do not think plaintiff by its actions thus far is now estopped to press its present contention; but the facts to my mind are very apparent that the transaction of January 1, 1939, was a reorganization or merger, pursuant to a plan of reorganization, and in no sense of the word a sale or exchange.

## Conclusions of Law

### I.

This court has jurisdiction of the parties and the subject matter of this suit.

### II.

Plaintiff is not estopped from pressing its present contention by its former claim that the transaction of January 1, 1939, constituted a reorganization, merger, or consolidation, or by its payment of its taxes based on that assumption. Robinson v. Commissioner of Internal Revenue, 6 Cir., 100 F.2d 847; Van Antwerp v. U. S., 9 Cir., 92 F.2d 871; Commissioner of Internal Revenue v. Mellon (Commissioner of Internal Revenue v. Scaife) 3 Cir., 184 F.2d 157; Belknap v. U. S., D.C., 55 F. Supp. 90, at pages 97 and 98.

### III.

The transaction of January 1, 1939, was a tax-free merger or reorganization under sections 112(b)(3) and 112(g) of the Internal Revenue Code of 1938, as amended. The transaction complied with the provisions of the Internal Revenue Code as the assets of Maybar were transferred in consideration solely for voting stock of Forrest. The reorganization presupposed a continuity of existing corporate business and the continuing of that business without withdrawing assets from the business, distribution to any stockholders, or loss of interest to any stockholders of either of the merged corporations.

### IV.

Maybar and Forrest intended, and in fact consummated, a plan of reorganization, which plan fully meets the statutory requirements of section 112(g)(1)(B) of the Internal Revenue Code as to the requisite continuing of interest upon which the organizational aspect of the act is bottomed.

### V.

Since the sum of $148,014.16 owed by Maybar to Forrest as rent at the time of the transaction was not a consideration, or part of the purchase price in acquiring the lease from Maybar, it cannot be amortized as an exhaustible expenditure and part of the purchase price.

### VI.

The additional taxes assessed against plaintiff and paid by it under protest were properly assessed and collected, and, therefore, plaintiff should recover nothing in either of these suits. Judgment finding for the defendant and taxing plaintiff with the costs should be rendered.